CHARLES S. LIGE AND GILBERT H. FRANCIS, DIRECTOR, DIVISION ON CIVIL RIGHTS, APPELLANTS, v. TOWN OF MONTCLAIR; MAYOR AND COMMISSIONERS, RESPONDENTS.

Argued May 10, 1976—Decided November 30, 1976.

*Mr. Stephen Skillman,* Assistant Attorney General, argued the cause for appellants (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Skillman* of counsel; *Mr. Raymond A. Nobel,* Deputy Attorney General, on the brief).

*Ms. Margaret C. Poles,* a member of the Virginia Bar, argued the cause for amicus curiae Equal Employment Opportunity Commission (*Mr. Richard S. Cohen,* attorney).

*Mr. Joseph C. Dickson, Jr.* argued the cause for respondents.

*Mr. Bernard A. Kuttner* submitted a brief on behalf of *amici curiae* Anti-Defamation League of B'nai B'rith and Columbian Coalition, Inc. (*Messrs. Kuttner and Toner,* attorneys).

The opinion of the court was delivered by

SCHREIBER, J. In a complaint filed with the Division of Civil Rights, Charles S. Lige charged the Town of Montclair with violating the Law Against Discrimination, *N. J. S. A.* 10:5–1 *et seq.,* by refusing to hire him as a fireman because he was black. He averred that he had applied for a fireman's position and had failed a written test taken on November 6, 1971. This complaint was amended to allege that the testing and selecting procedures "are fair in form but discriminatory in operation" and to seek compensatory damages.

A second amended complaint, which incorporated the first amended complaint, added a second count in which the Director of the Division of Civil Rights claimed that the written employment examination had an unlawful discriminatory effect on black applicants and was not properly designed to measure the traits necessary for successful per-

formance of the duties of firemen and policemen.[1] He also charged that the selection procedures were "unvalidated" and had an unlawful potential to discriminate against black applicants.

Another complaint was filed by the Director against Montclair alleging that on December 29, 1971, nine black police officers were denied promotions as a result of tests which were not professionally validated and had a disparate effect on minority candidates. Therefore, it was asserted the Town violated the Law Against Discrimination.

Both matters were heard at the same time before a designated Hearing Examiner. At the hearing Mr. Lige testified that he had applied for the position of a Montclair fireman after having read a newspaper advertisement that an examination was to be given for police and firemen positions, although there were no openings in the fire department. Although Mr. Lige had graduated from an integrated high school in West Virginia and had also successfully completed one year of college, he failed the written test. Subsequently he found another job. Since no fireman had been added to the force, at the hearing Mr. Lige abandoned any claim for compensatory relief. The Hearing Examiner refused to permit questioning with respect to whether Lige would now or in the future accept a job with the Montclair Fire Department and of what, other than his educational background, his experience and training had consisted.

The Division produced one other witness, Mr. Carmen Cappadona, who had been a field representative for about two and a half years. As a result of his interviews with three screening board members (their function is explained below), he ascertained that in November 1971, applicants for the police and fire departments were given the same written

---

[1] *N. J. S. A.* 10:5–16 empowers the director to "reasonably and fairly" amend any complaint. In addition to aggrieved persons, the Commissioner of Labor and Industry, the Attorney General, or the Commissioner of Education may file complaints. *N. J. S. A.* 10:5–13.

standardized personnel examination, known as the Wonderlic test.[2] It consisted of 50 questions testing vocabulary comprehension, computation of mathematical problems, and deductive reasoning and ascertaining items of general knowledge.

To pass, the applicant had to attain a minimum score of 17 points and be in the top 75% of those taking the exam. Mr. Cappadona stated that he had been told the test had not been professionally validated. He was not qualified to judge whether the test was job related and did not know if the test could have been validated. The only test he examined was the one given on November 6, 1971.

If the applicant passed the written examination and the investigation by the detective bureau verified the record data, he would be then interviewed by a screening board which consisted of a psychologist, the town attorney, a college professor, a public school principal and an investment broker. The board had not been given any guidelines to be followed in its screening process or evaluation. The applicant was asked why he wanted to be a policeman or fireman; if a policeman, what he would do if he had to arrest a friend; whether if he were married, the hours of duty would cause any problems; and what personal injuries he had sustained. The board considered the applicant's attitude and demeanor. It graded each applicant and its recommendations were submitted to the Commissioner of Public Safety. The Commissioner, guided by no written standards, exercised an unrestricted discretion in making his choice.

The November 1971 test was taken by 58 men. It was not known who were black and who were white, so Mr. Cappadona eliminated approximately 12 to 15 whom he

---

[2]The Town noted the hearsay nature of this evidence, but did not contest its admissibility. All relevant evidence is admissible in hearings before the Division. *See N. J. A. C.* 13:4–12.8(b) and *N. J. S. A.* 10:5–16.

assumed were Caucasian because of their names, telephoned about 19 and attempted to visit 25 or 26. On this basis he concluded that 19 applicants were black and 39 white. Of the 3 blacks and 26 whites who passed the written test, 2 blacks and 10 whites did not survive the investigation made by the detective bureau and 2 whites were rejected by the screening board. The remaining 1 black and 6 of the 14 whites were appointed to the police department. Of the remaining white applicants 7 were placed on the police department waiting list. None was appointed to the fire department, but one was placed on the fire department waiting list.

As of June 1, 1972, there were 104 policemen, of whom 15 were black. The members of the police force had been hired at many different dates between December 1, 1936 and January 1, 1972. The blacks had been selected between May 15, 1940 and January 1, 1972. Since 1966, 9 of the 45 policemen employed had been black.

As of April 21, 1972, 3 of the 89 firemen were black. The employment of the 89 had commenced at various times between June 1, 1939 and October 19, 1971. Since 1970, only 3 had been hired, one of whom was black.

In 1970, Montclair had a population of 44,000, of which 12,000 were black. Of Essex County's 930,000 inhabitants, about 280,000 were black.

Mr. Cappadona testified that the police promotion procedures in 1971 (he did not examine the procedures in other years) were generally comparable to the hiring practices. The employment ladder ascended from patrolman and detective to sergeant, lieutenant and captain. Detectives were selected without written examination. Of the 14 detectives, 4 were black. However, to become a police sergeant, lieutenant or captain, a written exam had to be taken. The same screening board interviewed the applicants and made recommendations to the Commissioner who again exercising his unbridled discretion chose the successful promotees.

The 1971 written examinations for promotion were prepared by the Commissioner. The questions were derived from tests used by the National and State Association of Police Chiefs, the Essex County Police Academy and from his own experience. Cappadona was told the questions had not been professionally validated. He had not studied the questions, but understood they were geared to circumstances in Montclair. Examination papers were not signed, but only carried a number so that the applicant's identification remained unknown to the grader. A grade score of 70 was passing. The 1971 written exam for sergeant was failed by the 7 blacks who took it. Thirteen of the 29 whites passed. One black took the test for lieutenant and one for captain. They received the lowest exam grades in their respcetive groups and were not promoted. In 1969, when 5 promotions were made, 3 were black. No promotions had been made since then until 1971.

Each applicant for a promotion had received job evaluation scores from his supervisors. These ratings, which were also considered in the promotion process, ranged from 58 to 87.5 for the patrolmen and detectives. The black policemen's scores were between 58 and 81.3; 5 exceeded 70.

The five-man screening board's interrogation was directed to indicia of leadership, ability, initiative and good judgment. No blacks were interviewed for a sergeant's position since all had failed the written examination. Each black applicant had been screened for the lieutenant and captain vacancies.

In May 1972 a new Commissioner of Public Safety was chosen. He testified that because of the complaints that had been filed with the Division, Dr. John Seymour, Chairman of the Psychology Department at Montclair State Teachers College, was requested to prepare and submit an examination to be used for hiring purposes. Dr. Seymour proposed the Revised Beta Examination, which then replaced the Wonderlic test. The new examination consisted of 6 tests, all of which were visual, that is, based on pictures and drawings.

Each applicant was required to pass a physical examination. A new three-person screening committee had been designated to interview the applicants. The committee members had been furnished with specific criteria as guidelines. In 1973, there were 5 police vacancies and the new exam was given under the auspices of the college. The top 15 whose scores ranged down to 70 were selected. Only 2 blacks were in the group and one was hired. The Commissioner expressed his thoughts about selecting new employees:

* * * I think the best qualified men should be the ones appointed and hopefully a good percent of them would be black.

At the hearing the Town moved to dismiss Lige's complaint because he had suffered no damages, had not shown any discrimination was practiced against him, and was not seeking any redress. The Town denied any discrimination in its hiring or promotions and moved for dismissal of the Division's claims because it had failed to make out a *prima facie* case.

The Hearing Examiner found that 67% of the whites and 16% of the blacks passed the employment exam in November 1971, and that 36% of the white and 6% of the black applicants were approved for hiring. As for promotions, no blacks in 1971 passed the written test for sergeant and 45% of the whites did. No blacks were promoted in 1972 and 32% of the whites were. The black population of Montclair was 27.2%, and of Essex County 30%, but only 14% of the police department and 3.4% of the fire department were black. The Hearing Examiner held that these percentages when "taken together with the administration of invalidated tests," which demonstrated a "disproportionately negative effect on blacks," constitute a *prima facie* showing of discrimination and shifted the burden of going forward to the Town, although admittedly there had been no intentional discrimination by the Town.[3]

---

[3]The Hearing Examiner referred to *Griggs v. Duke Power Co.*, 401 *U. S.* 424, 91 *S. Ct.* 849, 28 *L. Ed.* 2d 158 (1971), which held that

Since the Town did not affirmatively offer significant evidence to establish the job relatedness of the written hiring or promotional tests, he concluded that administration of the tests violated the Law Against Discrimination.

under Title VII of the Civil Rights Act of 1964, 42 *U. S. C.* §§ 2000e–2000e–15, the Wonderlic test in the absence of evidence relating it to job performance was inadequate. For a criticism of the burden placed on employers to prove test validations see Note, Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 *Harv. L. Rev.* 1109, 1127, 1128, 1130 (1971). All applicants took the same examination and its lack of job relatedness does not necessarily support a finding that the test was racially discriminatory. *See Washington v. Davis,* 426 *U. S.* 229, 96 *S. Ct.* 2040, 48 *L. Ed.* 2d 597 (1976), where the Court held that the equal protection component of the Due Process Clause of the Fifth Amendment was not violated even though the number of black police officers was not proportionate to population mix and the qualifying written examination, which four times as many blacks failed as whites, was not validated. *See also Harper v. Mayor and City Council of Baltimore,* 359 *F. Supp.* 1187 (D. Md. 1973), where the court commented :

* * * A population comparison ignores the fact that all segments of the population may not be equally qualified for the positions in question, Chance v. Board of Examiners, 330 F. Supp. 203 (S. D. N. Y. 1971), and different groups within the population may have different levels of desire for the particular job, Castro v. Beecher, 334 F. Supp. 930 (D. Mass. 1971). And most importantly, acceptance of the idea that discrepancies between racial composition of the community and the plant or department alone make out a prima facie case of discrimination leads inevitably toward a narrowing of the Court's options in fashioning a remedy. If the problem is to be demonstrated by the mere fact of a discrepancy, then the solution logically must amount to an order to bring the employment statistics into line with the population statistics, lest the Court mandate a continuing prima facie violation. Hiring in that manner in the first instance is not required by law. No citizen has a constitutional right to have public employees perfectly reflect the racial composition of the hiring unit. Castro v. Beecher, 334 F. Supp. 930 (D. Mass. 1971), modified 459 F. 2d 725 (1st Cir. 1972) ; Stebbins v. State Farm Mutual Insurance Co., 5 FEP cases 142 (4th Cir. 1972). And courts must be careful not to give credence to such misconceptions through their evidentiary requirements. To hold that a discrepancy between the employment population and the community population is prima facie a violation of law would not be wise, and it is not required. [*Id.* at 1193–1194n. 5].

The Hearing Examiner also found that neither the screening board nor the Commissioner had received any standards or guidelines by which to operate. He found the entire selection process discriminatory. He recommended that the Town be found guilty of violating *N. J. S. A.* 10:5-4 and 5:12(a), and that the Director find that Lige was denied an equal opportunity because of his race and that he be placed on the fire department waiting list. The Hearing Examiner suggested issuance of an order to cease and desist use of any examination which had not been professionally validated, of oral screening board interviews, and of the exercise of an absolute discretion in the Commissioner without effective standards and protections against racial discrimination. He also indicated that the Director's order could require appropriate affirmative action to minimize "future effects of practices which have in the past resulted in racial discrimination."

The Director adopted the Hearing Examiner's findings of fact and conclusions of law. He ordered discontinuance of all tests until professionally validated and approved by the Division. Oral interviews by the Examining Board in the hiring process were prohibited. He ordered that Charles Lige and all others who took the exam on November 6, 1971 were to be reconsidered for the positions for which they applied, and that all black applicants who were denied promotion in 1971 were to be reevaluated. Nondiscriminatory selection and promotion methods were to be devised, subject to the Director's approval.[4] To remedy the past discrimination he provided:

Future appointments to the Montclair Fire Department shall be conducted on the following basis: One (1) qualified minority appli-

---

[4]Whether Lige's complaint should have been sustained is questionable since he did not seek any monetary award, no fireman's position had been filled, and the record is not clear on Lige's willingness to accept the position since the Hearing Examiner refused to permit examination along these lines.

cant shall be selected for every one (1) qualified white applicant until the total number of minority officers on the Fire Department equals at least fifteen (15) persons.[5]

The order provided that all black applicants who had been denied promotions in the Police Department in 1971 were to be reevaluated in accordance with non-discriminatory standards. The order stated that:

* * * Future promotions in the Montclair Police Department shall be made on the following basis:

One qualified Black applicant shall be promoted for every one qualified white applicant until 50% of those minority applicants deemed qualified by the re-evaluation have been promoted.

Montclair appealed from the entire order, but limited its appellate contentions to an appeal from the above quoted remedial portions of the order for the stated reason that Montclair had chosen to revise its selection and testing procedures. The Appellate Division reversed and we granted the Division's petition for certification. 68 *N. J.* 490 (1975).

The Appellate Division distinguished between relief to a specific person or persons and a remedy on a "class quota basis." It pointed out that "to rectify the wrongs of the past by a method of racial quotas which in itself invidiously discriminates against others * * * would defeat the very purpose of *N. J. S. A.* 10:5–1 *et seq.,* for which the Division was created, namely, to safeguard all individuals from invidious discrimination because of sex, race, color or creed." *Lige v. Town of Montclair,* 134 *N. J. Super.* 277, 281–282 (1975). It held the Division had exceeded its statutory power, had violated the federal and state constitutions and therefore struck down the ratio remedies. *Id.* at 282.

___

[5]The order does not provide for the contingency which might arise if there were an insufficient number of qualified minority applicants to fill the vacancies.

Anti-discrimination principles are espoused in the New Jersey Constitution and the Law Against Discrimination, *N. J. S. A.* 10:5-1 *et seq.* Article I, par. 5 of the 1947 Constitution, which did not exist in the 1844 Constitution, states:

No person shall be * * * discriminated against in the exercise of any civil or military right, * * * because of religious principles, race, color, ancestry or national origin.

This provision should be evaluated in the light of its historical meaning. Under the 1844 Constitution an individual's civil rights were not to be denied on account of his religious principles. Article I, par. 4. At the Constitutional Convention of 1947 the Joint Committee on Constitutional Bill of Rights reported to the Convention that "impairment of the basic truth of equality [had] manifested itself in the undemocratic practice of many employers to refuse employment to persons of certain racial or religious groups." III Proceedings of 1947 Constitutional Convention at 344–345. The Committee, recognizing that the Legislature had enacted the Law Against Discrimination and desirous of eliminating any possible doubts of its constitutionality, stated that "[t]oday, the principal threats to the truth of equality are found in practices of discriminations because of race, color, religion or national origin in the fields of employment, education, enjoyment of property and pursuit of a livelihood in a business, trade or profession." *Id.* at 345. It recommended that a new paragraph 5 be inserted in Article I which would include freedom from discrimination because of race, color, religion or national origin in obtaining employment.

The Committee acknowledged that distinctions based on race, color, religion or national origin were abhorrent to our democratic ideals and social conscience. It agreed wholeheartedly with Chief Justice Stone's comment in *Hirabayashi v. United States,* 320 *U. S.* 81, 100, 63 *S. Ct.* 1375, 1385, 87 *L. Ed.* 1774, 1786 (1943):

\* \* \* Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality.

The Law Against Discrimination, enacted in 1945, pre-dated the Constitution by two years. The Legislature deemed that Law an exercise of the State's police power to promote the general welfare and to fulfill the provisions of the Constitution guaranteeing civil rights. *N. J. S. A.* 10: 5–2. Those rights referred to in the statute may be considered to be those spelled out in greater detail in the 1947 Constitution. It has been held that effectuation of the mandate in Article I, paragraph 5 has been implemented by the Law. *Levitt & Sons, Inc. v. Div. Against Discrimination*, 31 *N. J.* 514, 524, appeal dismissed, 363 *U. S.* 418, 80 *S. Ct.* 1257, 4 *L. Ed.* 2d 1515 (1960).

The Law pronounces that discrimination because of race, creed, national origin or color threatens not only individual rights and privileges but menaces the institutions and foundation of a free democratic State. *N. J. S. A.* 10:5–3. All persons are to have the opportunity to obtain employment without such discrimination. *N. J. S. A.* 10:5–4. Any employer who refuses to hire or discriminates against an employee with respect to employment terms, conditions or privileges is guilty of an unlawful employment practice or unlawful discrimination. *N. J. S. A.* 10:5–12.

The act also provides that an aggrieved person may file with the Attorney General a verified complaint charging unlawful discrimination. *N. J. S. A.* 10:5–13. After investigation the Attorney General may conclude probable cause exists to support the allegations of the complaint and seek to resolve the matter by conciliation. If not amicably adjusted, he is to issue and serve a complaint in the name of the Division and a hearing is then to be held before the Division. The Commissioner of Labor and Industry is likewise empowered to make and file complaints. *N. J. S. A.* 10:5–13.

We have had occasion to acknowledge the strength of the public policy and the broad interpretation accorded the provisions of the statute. *See Jackson v. Concord Company,* 54 *N. J.* 113 (1969); *Passaic Daily News v. Blair,* 63 *N. J.* 474, 484 (1973). In *David v. Vesta Co.,* 45 *N. J.* 301, 327 (1965), we adverted to the fact that unlawful discrimination "is regarded as a public wrong and not merely the basis of a private grievance."

The remedial powers, reflecting that strong public policy, authorize the Director to "issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful employment practice or unlawful discrimination and to take such affirmative action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, * * * or extending full and equal * * * privileges to all persons, as, in the judgment of the director, will effectuate the purpose of this act * * *." *N. J. S. A.* 10:5–17.

This broad remedial affirmative power includes the right to take positive action which will operate prospectively to eliminate and prevent unlawful discrimination. We have hitherto, for example, upheld orders that required the posting in housing projects of notices of the Director's order prohibiting discrimination. These orders also required that pertinent data be constantly updated and submitted to the Division so that the Director could be assured that no unlawful discrimination in the housing project was being practiced. *Zahorian v. Russell Fitt Real Estate Agency,* 62 *N. J.* 399, 409–410 (1973). So, too, we have affirmed the validity of a rule requiring owners of multiple dwellings to file annual reports disclosing rentals and the identification of tenants. *N. J. Builders, Owners and Managers Association v. Blair,* 60 *N. J.* 330 (1972). In every case where the remedial authority of *N. J. S. A.* 10:5–17 has been used, the sanction has been applied to correct an injustice to an individual which has occurred and to be assured that no future discriminatory acts will take place.

The act has never been construed to authorize meliora-
tion of the effects of past discrimination in favor of in-
dividuals against whom no discrimination has been prac-
ticed. The Division in its pamphlet, *Employer Guide to
the New Jersey Anti-Discrimination Law* (1965) in a
section entitled "Quotas and Qualifications" has also con-
strued the Law Against Discrimination to prohibit racial
quotas to remedy past discrimination. The following ques-
tions and answers are set forth in the brochure:

*Q. Is it legal for an employer to make an agreement with any group
to hire a specific number of non-whites?*
A. No. Such agreements are discriminatory in nature.
*Q. Should an employer discriminate against white applicants in the
belief that he is complying with either State or Federal Law?*
A. There should be no discrimination either for or against groups of
employees, but rather provision for equality of opportunity and fair
treatment for all individual applicants. [Emphasis in original; at 5].

We find nothing in the legislative history which bespeaks
an interpretation authorizing the dissolution of discrim-
inatory consequences by a racial quota. The statutory lan-
guage refers to future action to cure a wrong to an in-
dividual. It addresses itself with respect to persons gen-
erally, as distinguished from individuals against whom dis-
crimination has been practiced, only in the sense of making
certain that they *will receive in the future* full and equal
privileges. This is not to say that some actions to eliminate
or reduce the results of prior discrimination may not be
appropriate to assist the extension of full and equal priv-
ileges to persons against whose class there has been dis-
crimination. But the act does not empower the Division
to accomplish that result by imposition of a racial quota.

The Director of the Division on Civil Rights and the
United States Equal Employment Opportunity Commis-
sion, *amicus curiae,* argue that federal courts have construed
Title VII of the Federal Civil Rights Act of 1964 to au-
thorize racial quotas to remedy past injustices to a class
in favor of individuals who had not been directly and ad-

versely affected. 42 *U. S. C.* §§ 1981, 1983, 2000e–5(g). *See Associated Gen. Contractors of Mass., Inc. v. Altshuler,* 490 *F.* 2d 9, 16–17 (1st Cir. 1973), cert. den. 416 *U. S.* 957, 94 *S. Ct.* 1971, 40 *L. Ed.* 2d 307 (1974); *Rios v. Enterprise Ass'n Steamfitters Loc. 638 of U. A.,* 501 *F.* 2d 622, 629–630 (2d Cir. 1974); *Erie Human Relations Commission v. Tullio,* 493 *F.* 2d 371 (3d Cir. 1974); *Morrow v. Crisler,* 491 *F.* 2d 1053, 1056 (5th Cir.) (Fourteenth Amendment), cert. den. 419 *U. S.* 895, 95 *S. Ct.* 173, 42 *L. Ed.* 2d 139 (1974); *United States v. Masonry Cont. Ass'n of Memphis, Inc.,* 497 *F.* 2d 871, 877 (6th Cir. 1974).

The federal courts, however, have not sweepingly accepted the racial quota remedy. The Second Circuit has limited use of quotas to situations where there has been a "clear-cut pattern of long-continued and egregious racial discrimination" and the effect of the reverse discrimination must not be "identifiable", namely, that it may not be concentrated on a relatively small group of non-minority persons. *Kirkland v. New York State Dept. of Correctional Serv.,* 520 *F.* 2d 420, 427 (2d Cir.), reh. *en banc* den., 531 *F.* 2d 5 (2d Cir. 1975). The *Kirkland* test has not been satisfied in this case. Montclair's discrimination was unintentional and only the tests given in November 1971 were shown not to have been validated. A clear-cut pattern of long continued and egregious racial discrimination has not been established. Furthermore, the effect of the reverse discrimination at least with respect to promotions in the police department is directed against a small identifiable non-minority group.

Some federal courts have refused to sanction racial quotas to remedy past discriminatory promotion practices. *See Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission,* 482 *F.* 2d 1333 (2d Cir. 1973), cert. den. 421 *U. S.* 991, 95 *S. Ct.* 1997, 44 *L. Ed.* 2d 481 (1975), where the Court wrote with respect to promotions that "the imposition of quotas will obviously discriminate against those Whites who have embarked upon a police career with the

expectation of advancement only to be now thwarted because of their color alone. The impact of the quota upon these men would be harsh and can only exacerbate rather than diminish racial attitudes." [*Id.* at 1341]. *See also Equal Employment Opportunity Com'n v. Local 638,* 532 *F.* 2d 821 (2d Cir. 1976); *Patterson v. American Tobacco Co.,* 535 *F.* 2d 257 (4th Cir. 1976).

We note in passing that some Congressional history indicates that racial quotas were not to be permissible under the Federal Civil Rights Act of 1964. *See* 110 *Cong. Rec.* 7213 (1964) (memorandum of Senators Case and Clark); 110 *Cong. Rec.* 7218 (1964) (memorandum of Senator Clark); 110 *Cong. Rec.* 12723 (1964) (remarks of Senator Humphrey); 110 *Cong. Rec.* 14331 (1964) (remarks of Senator John J. Williams); *N. Glazer, Affirmative Discrimination* 44–45 (1975); *see also* 42 *U. S. C.* § 2000e–2(j). See dissenting opinion of Judge Hays in *Rios v. Enterprise Ass'n Steamfitters Loc. 638 of U. A.,* 501 *F.* 2d at 634, and concurring opinion of Judge Feinberg in *Equal Employment Opportunity Com'n v. Local 638,* 532 *F.* 2d at 833.

Two recent cases have rejected the use of quotas as appropriate affirmative action under the Federal Civil Rights Act. In *Flanagan v. President and Directors of Georgetown College,* 417 *F. Supp.* 377 (D. D. C. 1976), use of a quota to distribute scholarship funds as part of an affirmative action program under Title VI of the Civil Rights Act of 1964 was rejected. The District Court held that:

While an affirmative action program may be appropriate to ensure that all persons are afforded the same opportunities or are considered for benefits on the same basis, it is not permissible when it allocates a scarce resource (be it jobs, housing or financial aid) in favor of one race to the detriment of others. [*Id.* at 384].

In *Cramer v. Virginia Commonwealth University,* 415 *F. Supp.* 673 (E. D. Va. 1976), the court refused to permit the federally subsidized defendant university to discriminate against the plaintiff applicant for a teaching position on

the ground of sex where defendant was attempting to compensate for past deficiencies. To correct the imbalance in this manner would violate Title VII. The court concluded that "[r]eliance upon such discriminatory practices to achieve 'quotas' or 'goals' is the use of an unconstitutional means to achieve an unconstitutional end." [*Id.* at 680].

We are satisfied that the federal statute and the federal judicial interpretations which sanction racial quotas and discriminations against persons because of race are not apposite.[6]

The Director, to rectify a racial imbalance in the Montclair Police and Fire Departments, adopted two racial quotas. One-half of future appointments to the fire department had to consist of qualified blacks until there were 15 blacks in the department. Promotions in the police department required that one qualified black be promoted for every qualified white until 50% of the qualified blacks, whose promotions had been rejected in 1971, had been advanced.

The Director's orders granted priorities to black applicants and employees *vis-a-vis* others (assuming the minimum standard is met) without regard to the particular training, experience, and education of each applicant. It may be significant that only two blacks were in the top 15 of those who took the Revised Beta Test which, we were advised on oral argument, has been approved by the Division. The lack of some basic educational prerequisites such as the ability to read and understand may have resulted in failure. Equality of opportunity in employment will become more realistic when co-equality of opportunity in education exists. Lowering the standards for the Montclair Police

---

[6]In *McDonald v. Santa Fe Trail Transp. Co.*, 427 *U. S.* 273, 96 *S. Ct.* 2574, 49 *L. Ed.* 2d 493 (1976) the Supreme Court held that the Civil Rights Act of 1964 was applicable to whites who had been discriminated against in favor of a black, but it did not consider the impact of an affirmative action program. The Court wrote that the act is "not limited to discrimination against members of any particular race."

and Fire Departments is not the solution. *See N. Glazer, Affirmative Discrimination* 51–66 (1975).

Although the new examination procedures for hiring and promotions are to be non-discriminatory, the order permits a less qualified black to be employed or promoted over a more qualified white.[7] The inconsistency of applying non-discriminatory methods of employee selection and then disregarding those methods on racial grounds is apparent. Inherent in the Division's orders is a rejection of the concept that the more or most qualified should be hired and promoted. This rejection violates the fundamental precept in a democratic society that merit, not skin color, should determine an individual's place in society. Judge Smith in *Equal Employment Opportunity Com'n v. Local 638,* 532 *F.* 2d at 827, put it succinctly: ". . . 'reverse discrimination' contradicts our basic assumption that individuals are to be judged as individuals, not as members of particular racial groups."[8] Racial criteria squarely contradict the express and unambiguous language in Article 1, par. 5 of our Constitution.

In *Taylor v. Leonard,* 30 *N. J. Super.* 116 (Ch. Div. 1954), Justice Sullivan, then sitting as a Chancery Judge, struck down as violative of that constitutional provision a policy of the City of Elizabeth which applied a quota sys-

---

[7]The Montclair policemen and firemen are not subject to the Civil Service Act. A racial quota device for public employees under civil service may well conflict with constitutional and statutory provisions. Reference is made to Art. 7, § 1, par. 2 of the Constitution which requires appointments and promotions in the civil service of the State, and of such political subdivisions as may be provided by law, to be made according to merit and fitness to be ascertained, as far as practicable, by examination, which, as far as practicable, shall be competitive. *N. J. S. A.* 11:10–6.1 of the Civil Service Act requires the appointing authority to certify that a promotion or hiring was "not done by reason of race, color, political faith, creed, national origin, ancestry . . . ."

[8]In that case the United States Second Circuit Court of Appeals struck down use of a racial ratio for acceptance into a union apprenticeship program.

tem to determine the number of black occupants who were permitted to live in a public housing project. The quota limited black occupants to the percentage of black population in the City. Justice Sullivan pointedly wrote:

The evil of a quota system is that it assumes that Negroes are different from other citizens and should be treated differently. Stated another way, the alleged purpose of a quota system is to prevent Negroes from getting more than their share of the available housing units. However, this takes for granted that Negroes are only entitled to the enjoyment of civil rights on a quota basis. [*Id.* at 119].
* * * * * * * *
The eventual survival of any form of government necessarily depends on the equal apportionment of the rights and privileges of citizenship as well as its obligations and duties among all its citizens irrespective of race, color or creed. Such a principle has long since been the keystone of our national and state form of government. [*Id.* at 121].

Curing an illegally imposed racial discrimination against an individual is understandable and justifiable — but race is not an appropriate standard to apply on a class basis. The contention that the racial quotas imposed by the Director have a benign design to correct the wrongs of the past misses the point. As a matter of wisdom no one can quarrel with the overall purpose. It is the method which is pernicious. It is the racial classification irrespective of qualification that mandates its invalidation. Surely the proposed quota system is not benign to a more qualified white applicant who may be denied a job or promotion.

Nor is the discrimination any less invidious whether the non-minority person has been subjected to racial discrimination because the policy was in effect for a day, a month or years or whether he is one of a small identifiable class or an indefinite large group. The white, who has not been hired on the Montclair Fire Department or promoted in the Montclair Police Department because he was white and not black, could unquestionably charge in a complaint with the Division "unlawful discrimination" and an "unlawful employment practice" because of racial discrimination under

*N. J. S. A.* 10:5–12 a. The paradoxical position of the Director is manifest. He cannot and should not use the very criteria which the Legislature and the Constitution have condemned as a remedial device. It is important to recognize the difference between rectifying a racially improperly constituted school, *Jenkins v. Tp. of Morris School District and Bd. of Ed.*, 58 *N. J.* 483 (1971), for no one has a right to attend a segregated school; whereas an applicant for a job or a promotion has a right to be considered and judged irrespective of race.

Conceptually, use of the quota to right past wrongs raises the spectre of the interest of each minority. The protections of the New Jersey Constitution and the Law Against Discrimination are not restricted to blacks. We are a state of minorities. Is the composition of the Montclair Police Department to be measured against the population ratio of each minority group and, if imbalance be found, which assuredly will be the case for many groups, should a quota be used to "correct" the balance? Judge Halpern commented in the Appellate Division opinion below:

* * * We pride ourselves as a nation on the "mix" of our people wherein history has proven our strength lies. But that "mix" is comprised not only of blacks, but of Poles, Jews, Scandinavians, Italians, Puerto Ricans, Hungarians, Cubans, Germans and others too numerous to list. It is one thing for the Division to find that a given person has been discriminated against and give him relief. *See Zahorian v. Russell Fitt Real Estate Agency*, 62 *N. J.* 399 (1973). But when it fashions a remedy on a class quota basis, it leads to insoluble problems and piles discrimination on top of discrimination. [134 *N. J. Super.* 277, 281 (1975)].

It has been said that a racial quota is particularly invidious when applied to matters involving intellectual competency and capacity.[9] A racial quota is derogatory of and

---

[9] Dr. Kenneth B. Clark, a noted psychologist and sociologist, is quoted in an interview as having said: "For blacks to be held to lower standards, different standards or in some cases no standards is a most contemptible form of racism." Chicago Tribune, June 29, 1971.

patronizing to the intended beneficiary minority. Professor Thomas Sowell in his book, *Black Education, Myths and Tragedies* 292 (1972), writes:

[T]he actual harm done by quotas is far greater than having a few incompetent people here and there — and the harm that will actually be done will be harm primarily to the *black* population. What all the arguments and campaigns for quotas are really saying, loud and clear, is that *black people just don't have it,* and that they will have to be *given* something in order to have something. The devastating impact of this message on black people — particularly black young people — will outweigh any few extra jobs that may result from this strategy. Those black people who are already competent, and who could be instrumental in producing more competence among this rising generation, will be completely undermined, as black becomes synonymous — in the minds of black and white alike — with incompetence, and black achievement becomes synonymous with charity or payoffs.

In carrying out the Division's overall functions, it may be appropriate for the Director to consider methods to extend full and equal privileges to blacks who desire to join the Montclair Fire and Police Departments. Some means are available, though more time-consuming and more difficult than application of reverse discrimination. For example, in addition to the use of objective criteria and fair testing, the Town might attempt to obtain more qualified black candidates by alerting black students in colleges and recent high school graduates of the job opportunities before the next examination. A short course to familiarize the applicants with the nature and type of examination could be sponsored. *See, e. g., Carter v. Gallagher,* 452 *F.* 2d 315, 319 (8th Cir. 1971), modified on rehearing, 452 *F.* 2d 327 (8th Cir.) (*en banc*), *cert.* den. 406 *U. S.* 950, 92 *S. Ct.* 2045, 32 *L. Ed.* 2d 338 (1972). Some other *modus operandi* may be fashioned by the Town and the Division. Vacancies in the departments will occur and the imbalance due to the unintentional discrimination will ultimately be rectified.

In view of our holding herein we have not addressed ourselves to the equal protection clause of the 14th Amendment

to the Federal Constitution, and whether a "compelling state interest," if applicable, has been demonstrated. *See* dissenting opinion of Mr. Justice Douglas in *DeFunis v. Odegaard,* 416 *U. S.* 312, 333, 341–344, 94 *S. Ct.* 1704, 1714, 1718–1719, 40 *L. Ed.* 2d 164, 178, 182–185 (1974), wherein he comments that racial classification necessitates the strictest scrutiny under the equal protection clause; *Alevy v. Downstate Medical Center,* 39 *N. Y.* 2d 326, 384 *N. Y. S.* 2d 82, 348 *N. E.* 2d 537 (1976) ; *Harper v. Mayor and City Council of Baltimore,* 359 *F. Supp.* 1187 (D. Md. 1973) (strict scrutiny test not satisfied) ; *Anderson v. San Francisco Unified School District,* 357 *F. Supp.* 248 (N. D. Cal. 1972). In *Bakke v. Regents of University of California,* 18 *Cal. 3d* 34, 132 *Cal. Rptr.* 680, 553 *P. 2d* 1152 (1976), stay granted, —— *U. S.* ——, 97 *S. Ct.* 373, 50 *L. Ed.* 2d 321 (1976), petition for *cert.* filed, 45 *U. S. L. W.* 3437 (*U. S.* Dec. 14, 1976) (No. 76–811), the California Supreme Court found that a school admissions program which set aside 16 class openings for disadvantaged minorities was invalid because the procedure could result in acceptance of minority students whose qualifications were inferior to white applicants, that the discrimination was invidious, and that the compelling state interest criteria were not satisfied.

A quota creates castes and divides society. It is particularly abhorrent where we are striving for an equality in society in which race is totally irrelevant. *A. Bickel, The Morality of Consent* 133 (1973).

We find that the remedial provisions in the Director's order are violative of Article I, par. 5 of the State Constitution and beyond the power entrusted to the Director in *N. J. S. A.* 10 :5–17. We affirm the judgment of the Appellate Division. .

*OUTLINE OF DISSENTING OPINION BY PASHMAN, J.*

The Issue    P. 27

I   The Remedial Power of the Division on Civil Rights    29

II  The Propriety of Remedial Racial Quotas            34
    A. The Remedial Racial Quota as
       an Unlimited Remedy                             35
    B. The Remedial Racial Quotas as
       Fostering an "Unqualified"
       Work Force                                      41
    C. The Remedial Quota as Retroactive
       Relief                                          46
III  The Constitutionality of Remedial
     Racial Quotas                                     52
     Conclusion                                        62

PASHMAN, J. (dissenting).

## The Issue

Our decision today concerns the validity of an important tool in the arsenal of legal remedies for racial discrimination. We must decide whether the New Jersey Division on Civil Rights may utilize employment quotas or guidelines based upon racial criteria to undo the effects of past unlawful hiring practices when there has been no showing that these effects resulted from intentional, purposeful acts of racial prejudice.

At stake is a relatively narrow legal question concerning the legitimacy of quotas based on racial criteria *as a remedial measure of finite duration and scope, designed specifically to redress an administratively or judicially adjudicated finding of unlawful discrimination.* The majority finds that such measures are beyond the scope of the authority delegated to the State Division on Civil Rights and violate the New Jersey Constitution, Art. 1, ¶ 5, and the New Jersey Law Against Discrimination, *N. J. S. A.* 10:5-1 *et seq.* I unhesitatingly reach a contrary conclusion and therefore must dissent.

The subject of racial quotas, *regardless of their remedial intent,* evokes a visceral response whose emotional qualities may obscure thoughtful consideration of their beneficent effects. Yet this case does *not* concern the use of racial quotas as a means of redressing historical wrongs against

black citizens. Rather, we are called upon to consider a remedy for specific instances of past discrimination. The hearings conducted by the Division on Civil Rights produced ample evidence supporting the Division's findings of racial discrimination in the hiring and promotion practices of the Montclair Department of Public Safety;[1] the factual basis demonstrating a need for an effective remedy is clear. Moreover, this case does *not* provide an appropriate forum for evaluating the relative merits of different remedial devices, or general policy objectives such as equal employment opportunity and a qualified work force. Nevertheless, the narrow question posed by this case is of fundamental importance — the authority of the State Division on Civil Rights to utilize certain remedial devices in enforcing the constitutional proscription against invidious discrimination. *N. J. Const.* (1947), Art. 1, ¶ 5.

This question will require a three-part inquiry. First, I examine the source and extent of the power vested in the Division on Civil Rights to enforce the laws against discrimination. I will then consider some of the common misconceptions about remedial quotas and discuss the specific

---

[1]The majority suggests that the Hearing Examiner may have erred in relying on *Griggs v. Duke Power Co.*, 401 *U. S.* 424, 91 *S. Ct.* 849, 28 *L. Ed.* 2d 158 (1971). *Ante* at 11 n. 3. However, it fails to relate these general criticisms to the case at bar. Montclair made no attempt whatsoever to argue that its testing procedures were useful indicators of future job performance. On the contrary, the Commissioner of Public Safety testified that the Wonderlic test (which had been administered to Mr. Lige in 1971) was eliminated at the behest of the chiefs of the police and fire departments because they were dissatisfied with it. Unless the majority is willing to dispense with the requirement that the employer make *some* showing of job-relatedness, it must conclude that Montclair has clearly failed to rebut the complainant's statistical showing that the tests resulted in a selection of applicants exhibiting a racial pattern significantly different from that of the pool of candidates. *See Albemarle Paper Co. v. Moody*, 422 *U. S.* 405, 425, 95 *S. Ct.* 2362, 2375, 45 *L. Ed.* 2d 280, 301 (1975) ; *McDonnell Douglas Corp. v. Green*, 411 *U. S.* 792, 802, 93 *S. Ct.* 1817, 1824, 36 *L. Ed.* 2d 668, 678 (1973). *See also, infra* at 46 (Pashman, J. dissenting).

objections which the majority has raised to this form of relief. Finally, the constitutionality of these devices under the State and Federal constitutions will be addressed.

## I

### *The Remedial Power of the Division on Civil Rights*

As early as 1884, with the passage of the First Civil Rights Bill, *L.* 1884, *c.* 219, New Jersey began to chart a course of legislative initiatives outlawing various forms of discrimination and guarding against infringement of civil rights.[2] Among the legislative enactments designed to vindicate and safeguard these newly recognized rights was a 1938 act creating the New Jersey Goodwill Commission whose educational and informational functions were intended to "foster racial and religious understanding." *L.* 1938, J. R. 11.[3]

Although striking at numerous specific evils, these early efforts did not provide the comprehensive scheme needed to cope with the widespread incidence of invidious discrimination. Instead of constituting a uniform body of law, they represented a patchwork of remedial legislation confronting

---

[2] Among the statutory provisions which concern various civil rights interests, and which preceded the enactment of the Law Against Discrimination, *N. J. S. A.* 10:5-1 *et seq.*, in 1945, are the following: *L.* 1881, *c.* 149, p. 186 (recognizing right to a public education free from racial discrimination) ; *L.* 1933, *c.* 277 (prohibiting discrimination in public works employment on the basis of race, creed or color) ; *L.* 1938, *c.* 295 (prohibiting discrimination by State, counties or municipalities on the basis of age) ; *L.* 1941, *c.* 247 (prohibiting discrimination in matters of compensation, promotion or dismissal on the basis of sex or marital status) ; and *L.* 1942, *c.* 114 (prohibiting discrimination in public works or defense contract employment on the basis of race, color or creed).

[3] Because the Commission served a function which was primarily educational and informational in nature, and because it lacked any effective enforcement powers, its statutory authorization was repealed in 1945 by *L.* 1945, *c.* 170 concurrent with the enactment of the Law Against Discrimination.

only isolated instances of discrimination. *See* note 2 *supra.* Moreover, they lacked the administrative coordination and the remedial power to become effective instruments for enforcing State policy. As a result, dissatisfaction with the effectiveness of this legislation finally prompted the Legislature to adopt the omnibus Law Against Discrimination, *N. J. S. A.* 10:5–1 *et seq., L.* 1945, *c.* 169. *See generally,* Blumrosen, "Antidiscrimination Laws in Action in New Jersey: A Law-Sociology Study," 19 *Rutgers L. Rev.* 189 (1965).[4]

This statutory scheme not only recognized that discriminatory practices impinge upon the rights of individuals who are personally subjected to such treatment, but also acknowledged the debilitating effects which such practices have on the welfare of society at large. As *N. J. S. A.* 10:5–3 expressly provides:

> The Legislature finds and declares that practices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, marital status or because of their liability for service in the Armed Forces of the United States, are a matter of concern to the government of the State, and that *such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State.*
> [*N. J. S. A.* 10:5–3; emphasis supplied.]

In order to protect individuals discriminated against and to implement its general purpose and specific provisions, the Law Against Discrimination also provided for the cre-

---

[4]The implicit shift in emphasis from education to enforcement, upon which the Division on Civil Rights is founded, was not completed until 1960 with the creation of that agency by *L.* 1960, *c.* 59. Under the original Law Against Discrimination, a Division Against Discrimination was placed under the auspices of the Department of Education, and derived its powers under former Title 18 ("Education"), *N. J. S. A.* 18:25–1 *et seq.* For administrative purposes, particularly that of enforcement, the agency was reconstituted as the Division on Civil Rights in 1960, and transferred to the Department of Law and Public Safety in 1963. *L.* 1963, *c.* 40.

ation of a Division on Civil Rights. This agency, which is located in the Department of Law and Public Safety and is under the administrative leadership of the Attorney General, has been accorded broad powers to effectuate the statutory intent. *N. J. S. A.* 10:5–6 outlines this mandate as follows:

. . . [T]o prevent and eliminate discrimination in the manner prohibited by this act against persons because of race, creed, color, national origin, ancestry, age, marital status or sex . . . by employers, labor organizations, employment agencies or other persons and to take other actions against discrimination because of race, creed, color, national origin, ancestry or age . . . as herein provided; and the division created hereunder is given general jurisdiction and authority for such purposes.

In addition to having the power to accept or initiate complaints for violations of the Law Against Discrimination, *N. J. S. A.* 10:5–13, the Division has been empowered to undertake a variety of actions whose ultimate objective is the elimination of invidious prejudicial practices. Thus, it may promulgate rules, *N. J. S. A.* 10:5–8, investigate complaints, attempt conciliation between concerned parties, *N. J. S. A.* 10:5–14, hold hearings concerning the operation and effect of allegedly discriminatory practices, *N. J. S. A.* 10: 5–16, and even enforce provisions of the Law Against Discrimination in a summary proceeding before the Superior Court, *N. J. S. A.* 10:5–14.1. If the Division, after these various procedural steps, determines that there has been a violation of the Law Against Discrimination, it is statutorily authorized under *N. J. S. A.* 10:5–17 to:

. . . issue and cause to be served on such respondent an order requiring such respondent to cease and desist from such unlawful employment practice or unlawful discrimination and *to take such affirmative action, including, but not limited to,* hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership, in any respondent labor organization, or extending full and equal accommodations, advantages, facilities, and privileges to all persons, *as, in the judgment of the director, will effectuate the*

*purpose of this act*, and including a requirement for report of the manner of compliance . . . .

[*N. J. S. A.* 10:5-17; emphasis supplied.]

Courts have construed this aspect of the Law Against Discrimination liberally in order to effectuate its remedial purpose. *Fraser v. Robin Dee Day Camp*, 44 *N. J.* 480 (1965); *Levitt & Sons, Inc. v. Div. Against Discrimination*, 31 *N. J.* 514, 524 (1960), appeal dismissed, 363 *U. S.* 418, 80 *S. Ct.* 1257, 4 *L. Ed.* 2d 1515 (1960). As we stated in *Passaic Daily News v. Blair*, 63 *N. J.* 474 (1973):

This court has heretofore adopted a broadly sympathetic construction of the Law Against Discrimination and has interpreted the provisions thereof *pertaining to the remedial powers* of the Division on Civil Rights and the Director thereof with that high degree of liberality which comports with the preeminent social significance of its purposes and objects.

[63 *N. J.* at 484; emphasis supplied.]

*See also Jones v. Haridor Realty Corp.*, 37 *N. J.* 384, 392–393 (1962); *Gray v. Serruto Builders, Inc.*, 110 *N. J. Super.* 297, 306–307 (Ch. Div. 1970); *Polk v. Cherry Hill Apartments, Inc.*, 62 *N. J.* 55, 58 (1972); *N. J. Builders, Owners and Managers Ass'n v. Blair*, 60 *N. J.* 330, 336–338 (1972).

Initially, we must determine whether this broad grant of power was intended to include remedial quotas based upon racial criteria. Although such authority is not explicitly granted by the statutory provisions cited above and has not been considered by a court or the Division itself,[5] I find

---

[5] Contrary to the majority's implication, *ante* at 18, the question presented by this case is one of first impression. In this regard, the majority's reference to the 1965 Division on Civil Rights publication, *Employer Guide to the New Jersey Anti-Discrimination Law*, is misplaced. The quoted section of the pamphlet refers to a situation in which an employer unilaterally attempts to impose a quota on the work force which he hires. Such an action, regardless of how beneficently intended it may be, constitutes favorable and, hence, discriminatory treatment on behalf of a particular group. This is to

ample legal basis for inferring that it exists. Unlike those sections of the Law Against Discrimination which outline the procedure for considering allegations of discriminatory conduct, *N. J. S. A.* 10:5–17, the basic authorization of remedial powers is quite general in scope. In fact, that section expressly provides that the remedies which it suggests are not intended to be exclusive. In *Jackson v. Concord Co.,* 54 *N. J.* 113 (1969), for example, this Court upheld an award of compensatory damages ordered by the Division on Civil Rights for a person who had been subject to housing discrimination. The Court found this form of relief, though not mentioned in the statute, to be implicit in the broad ambit of *N. J. S. A.* 10:5–17:

> The permissible affirmative action is not fully defined. The section only says "including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, or restoration to membership, in any respondent labor organization" — obviously referring to discrimination in employment — "or extending full and equal accommodations, advantages, facilities and privileges to all persons" — undoubtedly referring, in great generality, to affirmative action in cases of unlawful discrimination in housing and places of public accommodation. We have earlier held, in analogous interpretation situations under this act, that terms like "include" are words of enlargement and not of limitation and that examples specified thereafter are merely illustrative. * * * This is especially so here where the word "including" is followed by the phrase "but not limited to." [54 *N. J.* at 126–127.]

Consequently, as the majority is willing to concede, *ante* at 17, New Jersey courts have demonstrated a willingness to sanction a variety of different remedies imposed by the Division on Civil Rights, despite the absence of specific statutory authorization. Such remedial measures have included the required submission of annual reports by owners of multiple unit dwellings on the number of minority tenants in their apartments, *N. J. Builders, Owners and Mana-*

---

be distinguished from a situation such as that in the instant case where a governmental agency attempts to correct the effects of past discriminatory practices.

*gers Ass'n v. Blair, supra;* compensatory damages for the increased cost of finding alternative, nonsegregated housing, *Jackson v. Concord Co., supra;* compensatory damages for pain and suffering caused by discrimination, *Zahorian v. Russell Fitt Real Estate Agency,* 62 *N. J.* 399 (1973); mandatory submission of lists of available apartments by certain landlords every 30 days for two years, *Polk v. Cherry Hill Apartments, Inc., supra;* and prohibition of classified advertising which segregates on the basis of sex, *Passaic Daily News v. Blair, supra.* An innovative approach by the Division on Civil Rights, coupled with the liberal interpretation of the Division's powers by the courts, has transformed *N. J. S. A.* 10:5–17 from a general mandate to pursue "affirmative action" into a viable and effective means of assuring equal protection under the law.

⋅This pattern of statutory interpretation indicates that judicially developed standards for "affirmative action" clearly encompass the type of relief ordered by the Division on Civil Rights in the instant case.

## II

### *The Propriety of Remedial Racial Quotas*

Though the majority apparently acknowledges the breadth of the remedial provisions of the Law Against Discrimination, *ante* at 16–18, it nonetheless rules out administratively or judicially imposed racial quotas as a permissible means of granting relief for past discrimination. The Court's criticisms of employment quotas are neither novel nor unusual. Indeed, its adamant opposition to this remedy is echoed by some critics who are disillusioned with current efforts by courts and administrative agencies to enforce the civil rights laws. *See, e. g.,* N. Glazer, *Affirmative Discrimination* (1975).

The majority begins from the premise that race can never be a criterion for preferential treatment because it is an "irrelevant" factor which bears no relation to merit or quali-

fications. It argues that racial guidelines exalt group, rather than individual interests, and divide society on the basis of race and ethnic background, thereby undoing the beneficial effects of the anti-discrimination laws. More importantly, the majority interprets the State Constitution to bar all such preferential plans, whether or not aimed at instances of past injustice. This Court is virtually alone in holding that an employment quota is *never* permissible as a remedial device aimed at wiping out the effects of discrimination. I believe that the majority has underestimated the necessity for such measures in many cases, and exaggerated their negative effects.

## A. *The Remedial Racial Quota as an Unlimited Remedy*

First, the majority's characterization of remedial quotas creates the spectre of a remedial bludgeon. Thus, the majority envisions that the remedial obligations imposed in this case will continue in perpetuity and will invite subsequent imposition of quotas to assist other groups. Indeed, the majority seriously suggests that a caste system will be the ultimate result of the remedial quotas which we consider today, *see ante* at 24. This characterization not only miscontrues the underlying purpose of preferential quotas, but overlooks their flexibility as a remedial device.

Quotas which are limited in scope and duration and which are properly designed to a particular area and a limited end will not encroach upon principles of fairness and reasonableness. One commentator has used the term "tailored decree" to characterize the need for quotas which are limited to eradicating the effects of past discrimination:

The tailored decree avoids a conflict with the stricture against preferential treatment based on race *if it observes two limitations.* The first is that, even though the class of beneficiaries may be predominantly, if not exclusively, blacks, *the benefits are not being conferred because of their race but because they are victims of discrimination.* Race is used to identify beneficiaries. but it is being used symptomatically, along with some other criteria, to identify the

victims . . . . The second limitation is that the benefit conferred is limited. It will result only in the applicant being treated equally. So long as the credit does no more than neutralize the discriminatory effect of the criterion, the claim can be made that, notwithstanding the outward appearance of unequal treatment (the additional credit), the beneficiaries are merely treated equally and thus the remedy is consistent with the theory of a fair employment law. [Fiss, "A Theory of Fair Employment Laws," 38 *U. Chi. L. Rev.* 235, 307–308 (1971) ; emphasis supplied.]

Accordingly, the federal courts have consistently approved quotas which were designed to remedy specific instances of past discrimination. Nine of the ten federal circuits have endorsed preferential hiring or promotion plans based upon decrees which were carefully molded to fit the exigencies of each situation. *See Patterson v. American Tobacco Co.,* 535 *F.* 2d 257, 273–274 (4 Cir. 1976) and cases cited.[7] For example, in *N. A. A. C. P. v. Allen,* 493 *F.* 2d 614 (5 Cir. 1974), the Fifth Circuit imposed a quota on future hiring by the Alabama State Police, stressing both the limited purpose served by the quota and its limited duration:

In conclusion we would note that this extraordinary remedy is not without its limitations. The use of quota relief in employment discrimination cases is bottomed on the chancellor's duty to *eradicate the continuing effects of past unlawful practices.* By mandating the hiring of those who have been the object of discrimination, quota relief promptly operates to change the outward and visible signs of yesterday's racial distinctions and thus, to provide an impetus to

[7] *Rios v. Enterprise Association Steamfitters Local 638 of U. A.,* 501 F. 2d 622, 628–31 (2 Cir. 1974) ; *United States v. N. L. Industries, Inc.,* 479 F. 2d 354, 377 (8 Cir. 1973) ; *Southern Illinois Builders Association v. Ogilvie,* 471 F. 2d 680, 683–86 (7 Cir. 1972) ; *United States v. Ironworkers Local 86,* 443 F. 2d 544, 552–53 (9 Cir. 1971) ; *United States v. International Brotherhood of Electrical Workers, Local No. 38,* 428 F. 2d 144, 149–51 (6 Cir. 1970) ; *Local 53 of International Ass'n of Heat & Frost I. & A. Workers v. Vogler,* 407 F. 2d 1047, 1053–54 (5 Cir. 1969) ; *Associated General Contractors of Massachusetts, Inc. v. Altshuler,* 490 F. 2d 9, 16–18 (1 Cir. 1973) ; *Carter v. Gallagher,* 452 F. 2d 315, 330 (8 Cir. 1971) ; *Contractors Association of Eastern Pennsylvania v. Secretary of Labor,* 442 F. 2d 159, 172, 176–77 (3 Cir. 1971).

the process of dismantling the barriers, psychological or otherwise, erected by past practices. *It is a temporary remedy* that seeks to spend itself as promptly as it can by creating a climate in which objective, neutral employment criteria can successfully operate to select public employees solely on the basis of job-related merit.

[493 *F.* 2d at 621; emphasis supplied.]

On the other hand, courts have been reluctant to sustain quotas where they have been used for purposes other than to overcome the effects of past discrimination. *See, e. g., Smith v. East Cleveland,* 363 *F. Supp.* 1131 (N. D. Ohio E. D. 1973), where the court declined to impose a quota on the grounds that there had been "positive efforts to erase the effects of past discrimination." 363 *F. Supp.* at 1152.[8]

Because remedial quotas are primarily intended to mollify the vestiges of specific instances of past discrimination, they will vary in content depending on the circumstances of each case. Among the remedial plans which have received judicial approval are orders which require an employer to hire a fixed number of minority employees, *Carter v. Gallagher, supra* (municipal fire department ordered to hire minority persons pursuant to a set ratio until 20 qualified minority persons had been employed), *United States v. Central Motor Lines, Inc.,* 325 *F. Supp.* 478 (W. D. N. C. 1970) (preliminary injunction granted to require the employment of six blacks as over-the-road drivers). Alternatively, courts have ordered employers to hire minority em-

---

[8] It is precisely for this reason that *Kirkland v. N. Y. State Dep't of Correctional Serv.,* 520 *F.* 2d 420 (2 Cir. 1975), and the test which the majority finds implicit in that case, are inapposite to the present set of facts. As the Court of Appeals expressly found, the court-ordered quota was overbroad in its operation and effect:

Insofar as the order appealed from imposes *permanent* quota restrictions upon those who seek advancement by means of a court-approved job-related civil service examination we reverse. The benefits of such order are not limited to the plaintiff class. Its quota requirements are based upon a shifting and rapidly expanding racial base, *wholly unrelated to the consequences of any alleged past discrimination.*

[520 *F.* 2d at 430; emphasis supplied.]

ployees until they comprise a fixed percentage of the relevant work force, *United States v. Local 212, IBEW*, 472 F. 2d 634 (6 Cir. 1973) (labor union ordered to acquire an 11% black membership), *N. A. A. C. P. v. Allen, supra* (Alabama State Police ordered to hire blacks on a one-to-one basis until 25% of the supporting personnel were black), *Buckner v. Goodyear Tire & Rubber Co.*, 339 F. Supp. 1108 (N. D. Ala. M. D. 1972) (set percentages established for admission of minority persons to pre-apprentice and apprentice training programs). Finally, courts have utilized orders which have required hiring of minority employees according to a fixed ratio, *Vogler v. McCarty*, 451 F. 2d 1236 (5 Cir. 1971) (labor union ordered to make referrals to whites and blacks on a one-to-one ratio), or decrees which require employers to hire minority employees on some other limited basis, *Castro v. Beecher*, 459 F. 2d 725 (1 Cir. 1972) (Boston police department ordered to make subsequent appointments to department from a priority pool of eligible minority applicants until priority pool had been exhausted), *Western Addition Community Org. v. Alioto*, 369 F. Supp. 77 (N. D. Cal. 1973), aff'd 514 F. 2d 542 (9 Cir. 1975) (San Francisco fire department required to appoint whites and blacks according to a one-to-one ratio until a designated list of qualified minority applicants had been exhausted).

The majority's emphasis on instances in which the federal courts have either limited or rejected quotas ignores the realization by those courts that this remedy is often necessary and proper in other cases. In fact, it relies on decisions which are wholly at odds with its blanket rejection of quotas. For instance, in *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission*, 482 F. 2d 1333 (2 Cir. 1973), cert. den. 421 U. S. 991, 95 S. Ct. 1997, 44 L. Ed. 2d 481 (1975), the Second Circuit expressly approved hiring quotas favoring applicants on the basis of race even though there was no showing of intentional discrimination. The opinion criticized the use of an "archaic test"

which was not job validated or job related, and the absence of any significant recruiting efforts aimed at minority persons. *Id.* at 1340. Although the court did strike down a promotion quota, it noted the lower court's failure to make a finding that the promotion examination was not job related. *Id.* at 1341.[9]

Likewise, in *Patterson v. American Tobacco Co., supra,* the Fourth Circuit noted the unanimity of opinion among other circuits, authorizing preferential relief as a remedy for unlawful discrimination, and itself upheld the propriety of such relief "when there is a compelling need for it." *Id.* at 274. It approved, in principle, the use of a promotion quota for supervisors, although it found that the employer's rate of appointments to supervisory positions was high enough to remove any compelling need for the quota in that particular case. *Id.* at 274–275.[10]

---

[9] *Kirkland v. N. Y. State Dep't of Correctional Serv., supra,* represents a departure from *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, supra,* and from other decisions by the Second Circuit, (see the opinions of Judges Mansfield and Kaufman dissenting from the denial of *en banc* reconsideration, 531 *F.* 2d 5, 5–11 (1975)) and has no counterpart in the Third Circuit's opinions. *See United States v. International Union of Elevator Constructors, Local Union No. 5,* 538 *F.* 2d 1012 (3 Cir. 1976); *Erie Human Relations v. Tullio,* 493 *F.* 2d 371 (3 Cir. 1974). Moreover, even *Kirkland* fails to support the majority's uncompromising rejection of all racial quotas. *Supra,* 520 *F.* 2d at 427. It may be noteworthy that Judge Smith, writing for the panel in *Equal Employment Opportunity Com'n v. Local 638,* 532 *F.* 2d 821 (2 Cir. 1976) — a post-*Kirkland* case — expressed his own opinion that a temporary quota for entrants to a union apprenticeship program was an appropriate remedy. *Id.* at 831–832. Furthermore, Judge Feinberg, in concurrence, suggested that the remedy could be limited to giving preferential treatment to identifiable plaintiffs who were themselves discriminatorily denied jobs — a remedy which would grant relief to the class of applicants who failed the 1971 examination in this case. *Id.* at 834. *See infra* at 51 (Pashman, J., dissenting).

[10] Two other cases cited by the majority, *Cramer v. Virginia Commonwealth University,* 415 *F. Supp.* 673 (E. D. Va. 1976) and *Flanagan v. President & Directors of Georgetown College,* 417 *F. Supp.* 377 (D. D. C. 1976), *ante* at 20 did not involve instances of

The quotas adopted by the Division on Civil Rights — as modified below — are well within the standards articulated by the federal courts. First, the Division imposed numerical goals only where gross under-representation of minorities on the work force would have ensured that the effects of past hiring practices would have continued indefinitely without drastic action. Thus, it refused to require hiring goals for the police department, even though black representation in the force (14.7%) is substantially less than the proportion of blacks in the community (27.2%). Similarly, it only revised the testing and selection procedures for hiring in the fire department, because one of the three black employees was in a promotional position. Second, the Division limited the quota relief to a stated period of time, and set reasonably attainable numerical goals which can be met by Montclair without excessive disruption. Both features are consistent with the model of a "tailored decree."

In one respect, however, the Director's order is unsatisfactory and should be revised. Paragraph 6 orders the Montclair Fire Department to hire at least 15 qualified minority applicants on a one-to-one basis with white applicants. They are to be taken initially from the pool of applicants who took the 1971 examination and are deemed qualified under the newly adopted nondiscriminatory procedures. After the pool is exhausted, hiring is to continue at the prescribed rate until the requisite number of applicants is appointed.

---

past discrimination similar to the practices in this case. However, it is interesting that the District Court in *Cramer* rejected any form of affirmative action program granting preference on the basis of race or sex, even though the Fourth Circuit Court of Appeals had just recently endorsed the use of racial quotas for some purposes in *Patterson v. American Tobacco Co. supra.* The Court's hostility to these plans is apparent from the following excerpt:

The primary — the only — beneficiaries of affirmative action plans and their siblings are the thousands of persons engaged in the civil rights business, bureaucrats, lawyers, lobbyists and politicians. The persons who are suffering are the ostensible objects of the plans' solicitude, and persons, such as plaintiff herein, who get flattened by the civil rights steamroller. [415 *F. Supp.* at 681]

For reasons I discuss below, *see* Part III, I would limit the quota relief to the class of persons who were directly subjected to the discriminatory hiring procedures, and release Montclair from the one-to-one requirement after all members of the pool have been hired or have declined appointments.

Finally, contrary to the majority's suggestion, the imposition of such relief will not entail imposition of similar quotas to protect the interests of other racial or ethnic groups. Judicial validation of quotas in certain cases does not mean that all racial or ethnic groups are entitled to a fixed percentage or established representation on each governmental agency or with each private concern subject to the Law Against Discrimination. Such relief can only be imposed if there has been an adjudication of *past discrimination* whose effects continue to be felt. Even though there may have been minority applicants in the past, these complainants must also prove that the employment practices discriminated against them in purpose or effect. Minority groups which may have just moved into the area will be unable to prove that proportional under-representation is related to past discrimination. Accordingly, I would find the quotas imposed by the Division on Civil Rights, being limited in scope and operation, to be valid exercises of the Division's remedial powers.

B. *The Remedial Racial Quotas as Fostering an "Unqualified" Work Force*

Next, the majority argues that remedial quotas will promote and even require the hiring of unqualified municipal employees. This argument appears to be based on the conclusion that failure to pass an examination — regardless of which examination is administered, what skills it tests, and whether it is professionally validated — indicates a lack of education which in turn shows that one is unsuited for the job. As the majority states:

> The Director's orders granted priorities to black applicants and employees *vis-a-vis* others (assuming the minimum standard is met) without regard to the particular training, experience, and education of each applicant . . . . Equality of opportunity in employment will become more realistic when co-equality of opportunity in education exists. Lowering the standards for the Montclair Police and Fire Departments is not the solution.
>
> [*Ante* at 21]

Although this argument may appear plausible at first, careful examination rebuts any notion that these guidelines require a harmful "lowering of standards" by Montclair.

The order issued by the Division on Civil Rights fully recognizes the critical need for qualified applicants and therefore limits the pool of eligibles to minority candidates who have demonstrated that they were so qualified:

> 6. Future appointments to the Montclair Fire Department shall be conducted on the following basis: One (1) *qualified* minority applicant shall be selected for every one (1) *qualified* white applicant until the total number of minority officers on the Fire Department equals at least fifteen (15) persons . . . .
>
> *       *       *       *       *       *       *       *
>
> 11. The black applicants who are deemed *qualified* by this re-evaluation shall be so notified in writing. Future promotions in the Montclair Police Department shall be made on the following basis.
>
> One *qualified* black applicant shall be promoted for every one *qualified* white applicant until 50% of those minority applicants deemed *qualified* by the re-evaluation have been promoted.
>
> [Emphasis supplied]

Thus, to the extent that the majority is concerned with a "lowering of standards" in the fire and police departments of Montclair to accommodate less-than-qualified or incompetent candidates, it should be satisfied by the requirement that the eligible applicants pass the revised examination adopted by the Montclair Department of Public Safety.

More troubling is the balance that the majority strikes between the concept of merit, as measured by standardized, written tests, and the goal of fair employment for minority group members. As illustrated by the case at bar, the real question to be considered is not whether public agencies

should insist upon obtaining qualified employees. The necessity for this is obvious. Rather, the important questions which must be addressed are (1) what are the relevant job qualifications and how should they be measured and (2) can a supposedly "more qualified" applicant be by-passed to hire an applicant for purposes of redressing the effects of past discrimination.

As to the first inquiry, the majority fails to address the question squarely, but it apparently is willing to accept criteria which place a premium on educational background. The record contains no evidence concerning relevant job qualifications because the respondents chose not to rebut the appellants' *prima facie* case; moreover, the question has now become moot with the development of new employment procedures which have won the approval of the Division on Civil Rights. Nonetheless, the same issue will surely arise in subsequent cases, and I must differ with the majority's position that "coequality of education" is the only solution to the problem at hand. Indeed, the presumption that certain written tests serve a discriminatory function by acting as "built-in headwinds" for minority candidates is based on the likelihood that these applicants have been denied the schooling and cultural opportunities available to whites. *See, Griggs v. Duke Power Co., supra*, 401 *U. S.* at 431, 91 *S. Ct.* at 853, 28 *L. Ed.* 2d at 164. To sanction overdemanding requirements which are not proven indicators of job performance is tantamount to permanently foreclosing employment prospects for a generation of minority workers.[11]

---

[11]The history of this Court's continuing efforts since *Robinson v. Cahill*, 62 *N. J.* 473 (1973), to guarantee equal educational opportunity to the State's schoolchildren should give the majority reason to hesitate before concluding that "coequality of opporunity in education" is the key to equal employment opportunity. See our opinions and orders after *Robinson I, supra*: 63 *N. J.* 196 (1973) (*Robinson II*); 67 *N. J.* 35 (1975) (*Robinson III*); 69 *N. J.* 133 (1975) (*Robinson IV*); 69 *N. J.* 449 (*Robinson V*); 70 *N. J.* 155 (*Robinson VI*). Contrary to the majority's assumption, temporary quotas are more likely to produce lasting results because they provide a

Moreover, such a decision is fundamentally unfair. As Justice Powell remarked in *McDonnell Douglas Corp. v. Green*:

> *Griggs* was rightly concerned that childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives.
>
> [411 *U. S.* at 806, 93 *S. Ct.* at 1826
> 36 *L. Ed.* 2d at 680]

*See generally,* Cooper and Sobol, "Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion," 82 *Harv. L. Rev.* 1598, 1640 (1969).

The majority also fails to recognize the problem inherent in the concept of "merit," as it is used in this context. Hiring and promotion procedures are designed to identify candidates who are most likely to perform well in a given position. These procedures should focus on achievements or innate talents only to the extent that those characteristics correspond to the demands of the employer. Though the merit system has served a salutary purpose in public employment by providing an objective measure for choice, it may have the undesirable effect of weeding out members of a particular racial or minority group on the basis of factors which are unrelated to job performance.[12] We should admit that

---

means by which minority persons can secure jobs in significant numbers. With this foothold, the informal processes of job recruitment attracts friends and relatives to the same work place. Professor Blumrosen refers to a "take-off point" where numerical standards will guarantee jobs for enough minority workers so that these ordinary processes will be sufficient to ensure fair employment practices. "Quotas, Common Sense, and Law in Labor Relations: Three Dimensions of Equal Opportunity," 27 *Rutgers L. Rev.* 675, 686 (1974).

[12]The majority's reference to State constitutional and statutory provisions which require civil service appointments and promotions to be made according to merit and fitness, as far as practicable, does highlight a potential conflict with *N. J. Const.* (1947), Art. I, ¶5, and *N. J. S. A.* 10:5-1 *et seq. Ante* at 22 n. 7. However, its statement of the conflict between coequal constitutional and statu-

these measurements of merit serve an allocative, rather than an evaluative, function, and recognize the value judgment implicit in preferring educational background. *See Karst and Horowitz,* "Affirmative Action and Equal Protection," 60 *Va. L. Rev.* 950 (1974).

Moreover, merit is necessarily defined by reference to community needs. I see nothing objectionable in a public employer making a concerted effort to recruit minority candidates in order to improve the efficiency of an agency's work in specific areas.[13] *See Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Commission, supra,* 482 *F.* 2d at 1340–1341 (2 Cir. 1973). In addition, other screening devices unrelated to educational background may be more valuable than written tests in assessing qualifications. For instance, in view of the strenuous, and often dangerous, nature of the work, a competitive physical examination may provide a better method for eliminating ap-

tory provisions does not dictate the conclusion that the State's antidiscrimination laws should yield to the merit principle, as defined by the civil service commission. In analogous settings, the federal courts have evaluated the criteria employed by the governmental unit to determine whether they were related to job performance. When no showing of job relatedness was forthcoming, these courts have required formulation of more suitable selection procedures and have imposed temporary quotas. For discussions of the competing factors, *see Carter v. Gallagher, supra,* 452 *F.* 2d at 322–324; *Boston Chapter, N.A.A.C.P., Inc. v. Beecher,* 504 *F.* 2d 1017, 1022 (1st Cir. 1974) ; *N.A.A.C.P. v. Allen, supra,* 493 *F.* 2d at 618–619. *But see Kirkland v. N. Y. State Dept. of Correctional Serv., supra,* 520 *F.* 2d at 428–429.

[13]This is not to say that only black policemen can work in black areas, or that the black community deserves a certain level of representation in the police department. Nor does a public agency have a legal duty to maintain a racial balance in its work force which reflects the racial composition of the community. However, these considerations may enter into an employer's judgment that a minority applicant is better qualified for a particular type of work. Whether or not this conclusion is desirable, it suggests that merit may encompass criteria which are directly linked to race. The danger in this practice, of course, is the risk that it will be used to channel minority employees into a limited area which prevents them from advancing.

plicants for a fire department. *Vulcan Society of N. Y. C. Fire Department, Inc. v. Civil Service Commission,* 360 *F. Supp.* 1265, 1276–1277 (S. D. N. Y. 1973), aff'd and remanded on other grounds, 490 *F.* 2d 387 (2 Cir. 1973).

Therefore, I would adhere to the standard adopted by the Hearing Examiner in this case and require that, when written tests or job criteria are shown to have a statistically disproportionate impact on a given racial or minority group, the employer demonstrate that the criteria measure skills which are necessary for satisfactory job performance. *Ante* at 28 n. 1 (Pashman, J., dissenting). *See Erie Human Relations Commission v. Tullio, supra,* 493 *F.* 2d at 373 (3d Cir. 1974); *Educational Equality League v. Tate,* 472 *F.* 2d 612, 618 (3d Cir. 1973); *Parham v. Southwestern Bell Tel.,* 433 *F.* 2d 421 (8th Cir. 1970). To this extent, I would qualify the suggestion in *Jackson v. Concord Co.; supra,* 54 *N. J.* at 119, that the complainant be given the burden of persuasion by a preponderance of the evidence. Where the employer's procedures include unvalidated testing devices and subjective evaluations, without adequate standards or safeguards against discrimination, it is enough that the complainant show discriminatory consequences. The employer is better equipped to identify the core of relevant considerations which add up to "business necessity." Moreover, in contrast to the individual complainant, the employer can draw upon a readily accessible fund of information and array of resources to establish the nondiscriminatory character of his procedures.

## C. *The Remedial Quota as Retroactive Relief*

The majority argues that the relief ordered by the Director serves an injustice to the white applicant who is passed over for hiring or promotion in favor of a putatively less qualified black candidate. In its view, quotas distort the basic policy of the Law Against Discrimination by instituting a temporary regime which is race-aware rather

than color blind and by discarding "the fundamental precept in a democratic society that merit, not skin color, should determine an individual's place in society." *Ante* at 22. It would avoid this pitfall by awarding retroactive relief solely to the individual who files the complaint, and trusting in prospective nondiscriminatory selection methods to eradicate the effects of past discrimination. While I do not underestimate the impact of quotas on the prospects of white candidates, I must nonetheless uphold their validity as the only effective means in many situations of making any significant inroads on racial discrimination.

Although our previous decisions have only considered situations in which prospective relief was sought, in no instance did we rule out more far-reaching retroactive remedies in appropriate cases. On the contrary, our willingness in the past to imply a variety of remedies without express statutory support has been animated by a belief that the State's commitment to equal rights would be ill-served by grudging, half-way applications of the Law Against Discrimination. *Ante* at 32 (Pashman, J., dissenting). To now limit the Director's remedial powers to the measures cited by the majority undermines constitutional and statutory guarantees against unequal treatment by permitting the racial imbalance in the work force caused by this discrimination to persist indefinitely.

It may be true that the natural processes of replacement as vacancies occur will "ultimately" alter the character of the departments, but such a result is unlikely to occur soon. As of 1972, the Montclair Fire Department had a force of 89 firemen, of whom three were black (3.4%). Of this number, 41 firemen had been appointed prior to the institution of testing in 1952; only three new employees, including one black, had been hired since 1970. Unless proportionally *more* blacks are hired through the selection process in the future, it is plain that the department will retain its lopsided racial character. Continued reliance upon educational background as the sole hiring criterion enhances

that probability. Even under the suggested quota, the number of blacks on the force would have reached only 15, or roughly 17%, in seven years.[14]

Of course, a concern for expeditious change assumes that a finding of racial discrimination requires vigorous efforts to eradicate that condition. Quotas often prove to be the only practicable means of vindicating the rights of victims of discrimination when there is an egregious pattern of past discrimination, see *U. S. v. International Union of Elevator Constructors, Local Union No. 5,* 538 *F.* 2d 1012 (3d Cir. 1976), or noncompliance with less drastic, court-ordered remedies, see *Western Addition Community Org. v. Alioto,* 369 *F. Supp.* 77 (N. D. Cal. 1973). In these instances, the ready availability of effective remedies discourages a recurrence of intentional discrimination. Moreover, their use demonstrates to all concerned that the law's proscriptions can have a sharp bite when flagrantly violated. Although this case presents no such examples of official recalcitrance or purposeful wrongdoing, I fear that the majority's wholesale rejection of the quota as a remedial device will hamper the Division on Civil Rights in disputes with less cooperative employers. Given the novelty of this question in our own courts and the recommendation of the Division on Civil Rights, it seems unwise for the majority to rule out the use of numerical standards in those situations.

Quotas are also appropriate when the employer is a public agency which has an affirmative duty to make special efforts to eradicate the vestiges of past discrimination, whether or not intentional.[15] *See, e. g., N.A.A.C.P. v. Allen, supra,*

---

[14]The Attorney General's brief for the Division on Civil Rights points out that only three vacancies per year are likely to occur in the fire department in the foreseeable future. Thus even if every vacancy were filled by blacks, the black representation would not approximate the racial composition of Montclair (27.2%) for seven years.

[15]It is interesting to note that President-elect Carter, in discussing his appointments to positions in the federal government, has an-

*Pennsylvania v. O'Neill,* 473 *F.* 2d 1029 (3 Cir. 1972) (*en banc*); *Carter v. Gallagher, supra.* We should expect the government to make more than token efforts in providing equal employment opportunities to minority citizens, particularly in light of the beneficial role that they can serve in promoting the welfare of the community. *Bridgeport Guardians, Inc. v. Members of Bridgeport Civil Service Com'n, supra,* 482 *F.* 2d at 1341.

The majority insists that class-wide relief is inappropriate in this case. However, the dual policies of *N. J. S. A.* 10:5–3 encompass both a general societal interest in upholding "the institutions and foundation of a free democratic State" against the corrosive effects of discrimination, as well as a more particularized interest in safeguarding individual rights and privileges. The relief in this case is vital to eradicate the cancer of discrimination. The majority, however, seizes upon individual grievances as the primary focus of the act, and construes *N. J. S. A.* 10:5–17 to restrict compensatory relief to minority applicants against whom discrimination has been practiced by the employer. It states:

Curing an illegally imposed racial discrimination against an individual is understandable and justifiable — but race is not an appropriate standard to apply on a class basis.

[*ante* at 23]

I disagree for two reasons.

First, this reading of the act contradicts its language. Even though *N. J. S. A.* 10:5–12 does define an unlawful employment practice or an unlawful discrimination in terms of an employer's treatment of an individual, *N. J. S. A.* 10:5–17 refers to affirmative action affecting "employees" and "all persons." Neither the specific wording nor the general import of the section warrants a distinction between

---

nounced that he will select large numbers of minority persons "to compensate for their exclusion in the past." **United Press International News Report**, November 18, 1976.

relief to cure a wrong to an individual and relief to remedy a wrong to a class. On the contrary, the language indicates that the individual complaint, if sustained, triggers the Director's power to take affirmative action which will "effectuate the purpose of this act," a formulation which goes beyond compensating the complainant for his own loss. *See N. J. S. A.* 10:5–3. Many of the measures expressly contained in the statute are clearly directed at the class of persons represented by the complainant, as this Court has recognized in upholding class-wide remedies. Indeed, the majority concedes the point by allowing some forms of affirmative action as a way of reducing the effects of past discrimination against a particular group of persons. *Ante* at 18.

Second, though I would limit hirings to qualified applicants in this instance, the only effective remedy for past discrimination may be to make relief available to the entire minority group. In some cases, the applicants who are turned away or who are unsuccessful on the examination may not be identifiable after the fact. Others may be deterred from even applying because they are aware of an employer's discriminatory practices. *See United States v. Sheet Metal Workers, Local 36,* 416 *F.* 2d 123, 132 (8 Cir. 1969) ; *Carter v. Gallagher, supra* at 331; *Morrow v. Crisler,* 491 *F.* 2d 1053, 1056 (5 Cir. 1974).

As I interpret the majority's decision, none of the black applicants who failed the 1971 test — including Mr. Lige — will be given preferential treatment in the future. Although free to take a nondiscriminatory examination and submit to the revised interviewing procedure (if they pass the test), they will not be given any advantages vis-a-vis future non-minority candidates. The order, as modified by the majority, is limited to a re-examination of injured claimants;[16]

---

[16]The majority's reference to Mr. Lige's complaint, *ante* at 13 n. 4, casts doubt on even his right to relief, apparently because no

past discrimination affords them no special status. In fact, it requires a minority applicant, whether or not he has been discriminated against, to demonstrate his superiority to either past or present non-minority candidates. As long as the majority's concerns lie with prohibiting the innocent stranger who was not a victim of discrimination from being hired, the problem of remedying discrimination will go unresolved. Moreover, the majority ignores those potential plaintiffs who may have failed the biased examination, but who are unwilling to travel the rigorous road to relief outlined by today's decision. Because the damage done by the unlawful hiring practices in this case extends beyond the few individuals who will be willing to submit to a re-examination, I would hold that all past applicants be given meaningful relief, as the Director's order indicates.

The majority favors a fully nondiscriminatory set of procedures which will yield the "best qualified" candidate. Unfortunately, it can offer no assurances that more blacks will be hired. Recruiting and special training may conceivably increase the number of black employees in the Montclair Department of Public Safety, but I doubt whether they can be effective in all instances. Therefore, because they will often be the only effective means of remedying discrimination within a reasonable length of time, I find a mandate for the use of racial quotas in the Legislature's declaration that racial discrimination "menaces" the foundations of our society.

---

fireman's position had been filled and he had not testified to his willingness to accept the job, if offered. However, paragraph 5 of the Director's order merely requires retesting of Mr. Lige, and grants him placement on a priority waiting list for future job openings. Surely, there is no conceivable reason to deny him this relief simply because he failed to testify on this point; indeed, his prosecution of this complaint suggests that he would accept the position. In any case, he is entitled to have the option of rejecting the job.

## III

### *The Constitutionality of Remedial Racial Quotas*

I turn now to the constitutionality of employing quotas based on racial criteria as a remedy for past discrimination. The majority did not find it necessary to reach the question of their legality under the fourteenth amendment to the United States Constitution because it found them violative of Article I, paragraph 5 of the New Jersey Constitution. Although I have reservations about the Director's order which lead me to alter its terms in one respect, *ante* at 18, I have no such doubts about the validity of racial quotas under either the State or Federal Constitution when they are essential to correct discrimination against minority groups.

As the majority interprets the "express and unambiguous language" of *N. J. Const.* (1947), Art. I, ¶ 5, the State can never rely upon race as a permissible criterion for inflicting a loss or burden upon an individual in society. It concludes that whether the purpose is benign, as in "reverse discrimination," or malign, as in official segregation, a racial classification is equally pernicious as a violation of "the fundamental precept in a democratic society that merit, not skin color, should determine an individual's place in society." *Ante* at 22. It operates insidiously towards whites and blacks alike, depriving more qualified whites of a fair opportunity for employment or advancement and casting aspersions on the abilities of those blacks who benefit from preferential treatment. Moreover, it suggests an unworkable and undesirable goal of proportional representation of minority groups in all institutions of society. In any case, the constitutional provision itself is regarded as straightforward:

No person shall be . . . discriminated against in the exercise of any civil . . . right . . . because of . . . race * * *

Nevertheless, our prior decisions suggest that we have not always viewed the State Constitution as strictly color

blind. In *N. J. Builders, Owners and Managers Ass'n v. Blair, supra,* the plaintiffs contended that a rule promulgated by the Division on Civil Rights was invalid under *N. J. S. A.* 10:5–12 because it required annual reports from multiple dwelling owners concerning the racial designation of tenants and applicants. A literal reading of our Constitution would have prohibited the rule, but we refused to ignore the salutary purposes of the reporting requirement in ending racial discrimination. Justice Mountain, writing for a unanimous Court, said:

It is now generally accepted that despite earlier statements describing the Constitution as being color blind, * * * *those who seek to end racial discrimination must often be acutely color conscious.* [60 *N. J.* at 336; emphasis supplied.]

This holding was consistent with our earlier decision in *Morean v. Bd. of Montclair,* 42 *N. J.* 237 (1964). There, we readily sustained a plan for the transfer and assignment of pupils within a school district, although the proposal was admittedly racially motivated and avowedly sought to control racial balance as among the several junior high schools. We rejected the contention that such action, directed to only some of the pupils within the district, was in violation of the equal protection clause. This Court said:

Constitutional color blindness may be wholly apt when the frame of reference is an attack on official efforts toward segregation; it is not generally apt when the attack is on official efforts toward the avoidance of segregation. [42 *N. J.* at 243–244]

Moreover, absent from the Court's holding in *N. J. Builders, Owners and Managers Ass'n v. Blair, supra,* was any basis for a distinction between plans for school desegregation and remedies for employment discrimination. Justice Mountain approvingly cited *Porcelli v. Titus,* 431 *F.* 2d 1254 (3 Cir. 1970), *cert.* den. 402 *U. S.* 944, 91 *S. Ct.* 1612, 29 *L. Ed.* 2d 112 (1971), and *Contractors Ass'n of Eastern Pa. v. Secretary of Labor,* 442 *F.* 2d 159 (3 Cir.

1971), *cert.* den. 404 *U. S.* 854, 92 *S. Ct.* 98, 30 *L. Ed.* 2d 95 (1971), even though they approve analogous instances of color-conscious relief which were ostensibly at odds with the statutory language. 60 *N. J.* at 337. It should be clear under our own Constitution, as it has been under the Federal Constitution, that the ideal of a color blind society does not rule out the recognition of racial factors in fashioning remedies.[17] We should heed one court's succinct resolution of this apparent paradox:

*The Constitution is both color blind and color conscious.* To avoid conflict with the equal protection clause, a classification that denies a benefit, causes harm, or imposes a burden must not be based on race. In that sense, the Constitution is color blind. But the Constitution is color conscious to prevent discrimination being perpetuated and to undo the effect of past discrimination.
[*U. S. v. Jefferson County Board of Educ.*,
372 *F.* 2d 836, 876–877 (5 Cir. 1966) ;
emphasis supplied.]

However, because I find that Article I, ¶ 5 of the State Constitution should be interpreted no more stringently than the Fourteenth Amendment in restricting preferential relief for past discrimination, *see Morean v. Montclair Board of Education, supra,* 42 *N. J.* at 242–243, I turn now to the more important question — whether, and under what circumstances, the Equal Protection Clause permits the use of racially preferential hiring and promotion methods.

---

[17]Of course, the majority's constitutionally mandated proscription against racial quotas will not wholly end their use in New Jersey. Aggrieved persons are still free to pursue their federal claims under Title VII after initially lodging a complaint with the Division on Civil Rights. *See* 42 *U. S. C. A.* § 2000–5(c). Given the Third Circuit's consistent approval of employment quotas as a remedy for past discrimination, *United States v. International Union of Elevator Constructors, Local Union No. 5, supra; Erie Human Relations Commission v. Tullio, supra; Porcelli v. Titus, supra,* litigants who seek effective relief will look upon the procedures of the Division as superfluous and seek to by-pass them, if possible.

Under equal protection analysis, it is axiomatic that governmental classifications based on racial criteria are inherently "suspect" and subject to the most "rigid scrutiny." *McLaughlin v. Florida,* 379 *U. S.* 184, 85 *S. Ct.* 283, 13 *L. Ed.* 2d 222 (1964); *Bolling v. Sharpe,* 347 *U. S.* 497, 74 *S. Ct.* 693, 98 *L. Ed.* 884 (1954); *Sweatt v. Painter,* 339 *U. S.* 629, 70 *S. Ct.* 848, 94 *L. Ed.* 1114 (1950). Suspect classifications may be sustained only when the State can demonstrate that they are required to achieve a "compelling state interest," *Loving v. Virginia,* 388 *U. S.* 1, 87 *S. Ct.* 1817, 18 *L. Ed.* 2d 1010 (1967), and that no neutral classification can serve the same end. *See Shelton v. Tucker,* 364 *U. S.* 479, 81 *S. Ct.* 247, 5 *L. Ed.* 2d 231 (1960). Since the Japanese Internment cases, the United States Supreme Court has nominally adhered to the position that an overriding governmental interest may justify imposition of burdens on a single racial group, *Korematsu v. United States,* 323 *U. S.* 214, 65 *S. Ct.* 193, 89 *L. Ed.* 194 (1944); *Hirabayashi v. United States,* 320 *U. S.* 81, 63 *S. Ct.* 1375, 87 *L. Ed.* 1774 (1943), but application of the strict scrutiny test has failed to produce any other acceptable justification for invidious discrimination. *See DeFunis v. Odegaard,* 416 *U. S.* 312, 340 n. 20, 94 *S. Ct.* 1704, 1717, 40 *L. Ed.* 2d 164, 182 (1974) (Douglas, J., dissenting). Moreover, the summary invalidation of various forms of state-enforced segregation in the wake of *Brown v. Board of Education,* 347 *U. S.* 483, 74 *S. Ct.* 686, 98 *L. Ed.* 873 (1954), suggested that reliance on racial criteria was never constitutionally permissible.[18]

---

[18]This string of. per curiam decisions appeared to go beyond Brown's emphasis on the inherently inferior nature of a separate facility. *See, e. g., New Orleans City Park Improvement Ass'n v. Detiege,* 358 *U. S.* 54, 79 *S. Ct.* 99, 3 *L. Ed.* 2d 46 (1958), aff'ing 252 *F.* 2d 122 (5 Cir. 1958); *Gayle v. Browder,* 352 *U. S.* 903, 77 *S. Ct.* 145, 1 *L. Ed.* 2d 114 (1956), aff'ing 142 *F. Supp.* 707 (M. D. Ala. 1956); *Holmes v. City of Atlanta,* 350 *U. S.* 879, 76 *S. Ct.* 141, 100 *L. Ed.* 776 (1955), rev'ing 223 *F.* 2d 93 (5 Cir. 1955). *See*

However, as courts have faced the task of enforcing the command in *Brown* to end segregated dual school systems, reliance on racial classifications became unavoidable. The Supreme Court recognized this fact in *Swann v. Charlotte-Mecklenburg Board of Education,* 402 *U. S.* 1, 91 *S. Ct.* 1267, 28 *L. Ed.* 2d 554 (1971), when it approved a desegregation plan which employed mathematical ratios reflecting the racial composition of the school population in assigning children to schools. Moreover, it admitted the necessity of racial classifications in the context of voting rights when it stated that a court had "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future."[19] *Louisiana v. United States,* 380 *U. S.* 145, 154, 85 *S. Ct.* 817, 822, 13 *L. Ed.* 2d 709, 715 (1965). *See Brooks v. Beto,* 366 *F.* 2d 1 (5 Cir. 1966) (race of grand jurors recognized); *Norwalk CORE v. Norwalk Redevelopment Agency,* 395 *F.* 2d 920 (2 Cir. 1968) (race of tenants for public housing).

Finally, courts have found authority for remedial preferential treatment in the genesis of the fourteenth amendment, recalling "the historical fact that the central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *Mc-*

Wechsler, "Toward Neutral Principles of Constitutional Law," 73 *Harv. L. Rev.* 1, 22 (1959); Hellerstein, "The Benign Quota, Equal Protection, and 'The Rule in Shelley's Case,'" 17 *Rutgers L. Rev.* 531 (1963).

[19]The United States Supreme Court's recent grant of certiorari in *Milliken v. Bradley,* — *U. S.* —, 97 *S. Ct.* 380, 50 *L. Ed.* 2d 325 (1976), suggests that it may define with more precision the permissible scope of federal court-ordered remedies aimed at the effects of past illegal school segregation. In addition, the Court's grant of a stay to the University of California from enforcement of the California Supreme Court's decision in *Bakke v. Regents of University of California,* 18 *Cal.* 3d 34, 132 *Cal. Rptr.* 680, 553 *P.* 2d 1152 (1976), indicates that the question which escaped review in *DeFunis* may finally be decided. *See* — *U. S.* —, 97 *S. Ct.* 373, 50 *L. Ed.* 2d 321 (1976).

*Laughlin v. Florida, supra,* 379 *U. S.* at 192, 85 *S. Ct.* at 288, 13 *L. Ed.* 2d at 228. *See Associated General Contractors Ass'n of Mass., Inc. v. Altshuler, supra,* 490 *F.* 2d ·at 16.

Thus, the remedial feature of racial quotas in employment cases sets them apart from preferential schemes designed merely to attain a racially balanced work force, and justifies reliance on racial criteria. *See, e. g., United States v. Wood, Wire & Metal Lath. Int. Un., Loc. No. 46,* 471 *F.* 2d 408, 413 (2 Cir. 1973); *Anderson v. San Francisco Unified School District,* 357 *F. Supp.* 248, 250 (N. D. Cal. 1972); *Local 53 of International Association of Heat & Frost I. & A. Workers v. Vogler,* 407 *F.* 2d 1047, 1052 (5 Cir. 1969). Justice Douglas, in the *DeFunis* case, discussed the propriety of using racial criteria as a *corrective measure* to offset biases in the selection procedures. *Supra,* 416 *U. S.* at 340, 342, 94 *S. Ct.* at 1718, 40 *L. Ed.* 2d at 182–183. In disapproving the University of Washington's application procedures favoring minority applicants, he noted that there was no evidence that minority applications had been deliberately blocked or discouraged in the past. Similarly, he said:

> There was also no showing that the purpose of the school's policy was to eliminate arbitrary and irrelevant barriers to entry by certain racial groups into the legal profession.
>
> [416 *U. S.* at 336 n. 18, 94 *S. Ct.* at 1715, 40 *L. Ed.* 2d at 180 n. 18]

Relying on the finding of past discrimination in this case, the Division on Civil Rights and *amicus* E.E.O.C. urge us to apply the rational basis test in reviewing the remedial scheme. This standard of review merely requires that the classification adopted by the State bear a reasonable relationship to a legitimate governmental interest. *Massachusetts Bd. of Retirement v. Murgia,* 427 *U. S.* 307, 96 *S. Ct.* 2562, 49 *L. Ed.* 2d 520 (1976); *Dandridge v. Williams,* 397 *U. S.* 471, 90 *S. Ct.* 1153, 25 *L. Ed.* 2d 491 (1970),

reh. den., 398 *U. S.* 914, 90 *S. Ct.* 1684, 26 *L. Ed.* 2d 80
(1970) ; *Lindsley v. Natural Carbonic Gas Co.,* 220 *U. S.*
61, 31 *S. Ct.* 337, 55 *L. Ed.* 369 (1911). *See McGowan v.
Maryland,* 366 *U. S.* 420, 81 *S. Ct.* 1101, 6 *L. Ed.* 2d 393
(1966).

Although I do not find these classifications to be "suspect"
in the traditional sense, I cannot agree that racial quotas
or any other comparable form of relief, should escape rig-
orous judicial review. However, benign the purpose behind
"reverse discrimination," such color conscious relief raises
fundamental constitutional issues. Yet, adoption of the strict
scrutiny standard suggests that racial quotas are equivalent
to invidious discrimination. It also implies that they work
such destructive results that they are justifiable only if the
state can demonstrate a "compelling need." Consequently,
it cripples any efforts for significant change :

It would indeed be ironic and, of course, would cut against the very
grain of the amendment, were the equal protection clause used to
strike down measures used to achieve real equality for persons whom
it was intended to aid.

[*Alevy v. Downstate Medical Center,* 39 *N. Y.* 2d
326, 384 *N. Y. S.* 2d 82, 348 *N. E.* 2d 537 (1976)].

The proper test — and one which has been applied by
most federal courts — is a modified version of the strict
scrutiny standard which examines the risk that the terms of
the quota will undermine the task of undoing past dis-
crimination. As such, it bears some resemblance to the
strengthened rational relation test which some judges and
commentators have discerned in United States Supreme Court
decisions striking down statutes on equal protection grounds
where neither a suspect classification nor a fundamental in-
terest was implicated. *See Dandridge v. Williams,* 397 *U. S.*
471, 520–521, 90 *S. Ct.* 1153, 1180, 25 *L. Ed.* 2d 491, 522–
523 (1969) (Marshall, J., dissenting) ; *Chicago Police
Dept. v. Mosley,* 408 *U. S.* 92, 92 *S. Ct.* 2286, 33 *L. Ed.*
2d 212 (1972) ; *Reed v. Reed,* 404 *U. S.* 71, 92 *S. Ct.* 251,

30 *L. Ed.* 2d 225 (1971) ; *cf. Wurtzel v. Falcey,* 69 *N. J.* 401, 408, n. 4 (1976) (Pashman, J., dissenting).

This departure from strict scrutiny has been premised on several grounds. First, the racial classifications in question have not been adopted as a means of *denying* opportunities to any racial or ethnic group, as prior practices did.[20] They have been devised to counteract the exclusive effects of past discrimination by increasing the number of minority employees. Second, unlike the wrong emphasized in *Brown v. Board of Education,* they have not stigmatized any excluded group as inferior. Rather they have recognized the needs of minority persons who have been victimized by persistent forms of racism. Third, these preferences are generally employed to ameliorate the treatment accorded blacks — a purpose in keeping with the original goal of the fourteenth amendment. *See Slaughter-House Cases,* 83 *U. S.* (16 Wall.) 36, 81, 21 *L. Ed.* 394 (1873) ; Bickel, "The Original Understanding and the Segregation Decision," 69 *Harv. L. Rev.* 1, 60 (1955). Although the fourteenth amendment is not confined to unequal treatment of blacks, the original purpose of the amendment should not be disregarded merely because its "suspect" categories have been expanded to include other minorities in analogous positions, *Yick Wo v. Hopkins,* 118 *U. S.* 356, 6 *S. Ct.* 1064, 30 *L. Ed.* 220 (1885) ; *Oyama v. California,* 332 *U. S.* 633, 68 *S. Ct.* 269, 92 *L. Ed.* 249 (1948) ; *Hernandez v. Texas,* 347 *U. S.* 475, 74 *S. Ct.* 667, 98 *L. Ed.* 866 (1954) ; *Graham v. Richardson,* 403 *U. S.* 365, 91 *S. Ct.* 1848, 29 *L. Ed.* 2d 534 (1971). Moreover, these measures do not prejudice an identifiable group which is a "discrete and insular" minority disadvantaged by the majoritarian political process. See Jus-

---

[20]This was the case in *Taylor v. Leonard,* 30 *N. J. Super.* 116 (Ch. Div. 1954), cited by the majority. Ante at 22. The quotas were utilized to *prevent* blacks from occupying public housing units in greater numbers. Moreover, they were part of a larger scheme of segregation which confined black tenants to a specified section of the housing project. *Id.* at 118.

tice Stone's footnote 4 in *United States v. Carolene Products Co.*, 304 *U. S.* 144, 58 *S. Ct.* 778, 82 *L. Ed.* 1234 (1937); Ely, "The Constitutionality of Reverse Discrimination," 41 *U. Chi. L. Rev.* 723 (1974).

However, even if a racial classification is not "suspect" in the strict constitutional sense when it is intended to benefit minority group members who have traditionally been subjected to invidious forms of discrimination, a preferential scheme which incorporates racial criteria must be carefully assessed to determine whether its features are reasonably designed to achieve a substantial governmental interest. Although decisions of administrative agencies should ordinarily be left undisturbed when they reflect special expertise and are supported by substantial evidence in the record, this more rigorous form of review should ensure that the same objective cannot be served by less onerous alternatives. In particular, such an inquiry should focus on the duration of the scheme and its impact on non-favored groups.

Here, as I have indicated, the Director's order does serve an important public purpose of vindicating the rights of persons who have been injured by practices which are prohibited by the Law Against Discrimination. The State clearly has an overriding interest in giving full effect to this act by ensuring that aggrieved persons are not left without a remedy. It also has a stake in seeking reasonably expeditious change in the character of a public entity which has excluded minority persons by discriminatory means.

At the same time, its remedial efforts must be attuned to the nature of the discriminatory conduct and the response of the wrongdoer. Where an employer has intentionally engaged in discriminatory practices, there is good reason to impose stringent conditions in order to avoid a recurrence of similar behavior. *See, e. g., Morrow v. Crisler, supra; United States v. Wood, Wire and Metal Lath. Int. Union, Local 46, supra; Western Addition Community Organization v. Alioto, supra.* Likewise, such measures are justified where an employer has refused to institute, or has not yet developed, a

set of nondiscriminatory procedures acceptable to administrative authorities or to a court. *See, e. g., N.A.A.C.P. v. Allen, supra; Boston Chapter, N.A.A.C.P. v. Beecher, supra; Vulcan Society of N. Y. C. Fire Department v. Civil Service, Com'n, supra.*

In the present case, however, Montclair has cooperated with the Division on Civil Rights in devising its procedures for hiring and promotion to avoid the discriminatory consequences of its former tests and interviewing methods. It has also shown a willingness to hire minority group members. To some extent, it appears that the current racial make-up of the police and fire departments reflects a low rate of turnover. Therefore, I cannot conclude that it is necessary to extend this preferential hiring scheme to black applicants *who have not been injured by past discrimination* in order to uphold the purposes of the act. As I have noted earlier, I would revise the Director's order to limit favored treatment to the class of black applicants who were denied eligibility for appointment on the basis of Montclair's unrevised procedures.

I emphasize once again that this limitation on the scope of relief is not required in every case. Different circumstances might well justify a remedial quota which encompasses persons who themselves have not been directly injured by discriminatory practices. *See ante* at 49. (Pashman, J., dissenting). However, I do find that anything less than the relief which I have outlined would have the unwarranted effect of leaving victims of past injustice wholly uncompensated.

Finally, I do not consider the duration of this order unduly long. Although Montclair will be subject to its provisions for approximately five years, the relatively few number of positions affected by the order makes this a reasonable period of time. Similarly, the impact of the preference on on other applicants, though not insignificant, is outweighed by the necessity of redressing the wrongs against black applicants.

Accordingly, I would modify paragraph 6 of the final order to give preferential treatment only to those minority candidates who were re-evaluated according to the provisions of paragraphs 4 and 5, in order to limit preferential relief to those who were injured by the discriminatory testing procedures. I would leave paragraph 11 intact.

## CONCLUSION

The majority decision today represents more than a lamentable judicial insensitivity to the difficult task of enforcing New Jersey's anti-discrimination laws. With the majority's sweeping requirement of constitutional color blindness, this Court has declared itself opposed to those forms of affirmative action for minorities which cause a perceptible loss to any member of a non-minority group. Not only has it flatly prohibited the use of any type of hiring or promotion quota as a remedy for past discrimination — a position taken by no other federal or state appellate court — but it has also invited challenges to a variety of other affirmative action plans aimed at the consequences of societal discrimination. Although I recognize that the facts of this case do not present the most egregious form of discrimination, I fear that the broad assertions of the majority's opinion will make it virtually impossible for our State agencies to combat more flagrant abuses.

I can only conclude that the majority's holding is a formula for another generation of delay. I respectfully dissent.

*For affirmance*—Chief Justices HUGHES, Justices MOUNTAIN, SULLIVAN, CLIFFORD and SCHREIBER and Judge KOLOVSKY—6.

*Dissenting*—Justice PASHMAN—1.